

Karen E. Keller
I.M. Pei Building
1105 North Market St., 12th Floor
Wilmington, DE 19801
(302) 298-0702
kkeller@shawkeller.com

June 1, 2020

**BY CM/ECF**
The Honorable Christopher J. Burke
United States District Court
844 N. King Street
Wilmington, DE 19801

    Re:    *Steuben Foods, Inc. v. Shibuya Hoppmann Corp. et al.*,
              C.A. No. 19-2181-CFC-CJB

Dear Judge Burke:

    We write on behalf of defendants Shibuya and Hood in response to plaintiff Steuben's letter of May 22, 2020, which offers the Court a bargain under which Steuben would drop three of the six patents being asserted in this case in exchange for the Court's lifting the stay on the '013 patent. Because there has been no material change in circumstances that would warrant lifting the stay on any of the currently stayed patents, the Court should reject Steuben's offer.

    **I. Considerations of judicial economy and fairness strongly favored entry of the stay order.**

    Steuben asserts six patents against Shibuya and Hood in this lawsuit, which was transferred from the Western District of New York earlier this year. After briefing and oral argument, this Court stayed proceedings on three of the patents-in-suit—the '468, '435, and '013 patents. *See* Dkt. No. 500. The stay was justified because the asserted claims of those patents either stood rejected in *inter partes* review ("IPR") or reexamination proceedings before the United States Patent and Trademark Office ("PTO") or else were before the Federal Circuit after the PTO had finally deemed them unpatentable. There was therefore a high likelihood that these claims would be held invalid.

    Considerations of judicial economy and fairness strongly favored a stay because, as the Court found, a stay would "avoid the need for, inter alia, claim construction proceedings, expert reports, expert discovery, and summary judgment" on patents that are likely to vanish. *Id.* That the patents-in-suit have all expired already is also significant because, as the Court also found, "even if the claims eventually do survive the reexamination proceeding, then money damages should be sufficient to compensate Plaintiff for any past infringement." *Id.* Hence, Steuben will suffer no undue prejudice from the stay.

    **II. No changed circumstances justify lifting the stay.**

    Scarcely more than three months after the Court issued the stay, Steuben requests that the stay be lifted, ostensibly due to changed circumstances. Yet none of the developments that Steuben cites justifies lifting the stay because none of them makes it any more likely that the

stayed claims will survive. Nor has anything changed to create a new risk of undue prejudice to Steuben from the stay.

### A. The Federal Circuit's remand of IPR proceedings on procedural grounds does not justify lifting the stay.

Steuben observes that the Federal Circuit remanded the IPRs on appeal to the PTO for further proceedings before a new panel of Administrative Patent Judges ("APJs") due to constitutional concerns about the appointment of the APJs who issued the Final Written Decisions in those IPRs. *See generally Arthrex, Inc. v. Smith & Nephew, Inc.*, 941 F.3d 1320 (Fed. Cir. 2019). But this remand does not cast doubt on the correctness of the PTO's decision rejecting the challenged claims on the merits, which turned on an issue of claim construction.

#### 1. None of the challenged claims is likely to survive PTO review.

To see why Steuben's chances of ever getting the challenged claims out of the PTO are so low, it is helpful to understand the basis for the PTO's decision that the claims are unpatentable. The patent specifications describe the term "aseptic" as the "FDA level of aseptic." *See, e.g.*, '013 patent at 1:67–2:2; 4:28–29. Steuben argued—and the PTO agreed—that achieving the "FDA level of aseptic" required compliance not only with FDA regulations limiting the number of microorganisms that can remain on the packaging after disinfection but also with regulations limiting the amount of hydrogen peroxide that can remain on the packaging after rinsing. Because the prior art before the PTO did not address the precise residual hydrogen peroxide amounts required by the FDA's regulations, the PTO initially found that the prior art did not render the claims obvious. On appeal, however, the Federal Circuit ruled that the PTO had erred in construing "aseptic."

Specifically, the Federal Circuit ruled that achieving the "FDA level of aseptic" did *not* include compliance with the FDA's regulations governing the amount of residual hydrogen peroxide that can remain on the package. Therefore, the residual hydrogen peroxide regulations did not need to be satisfied for a prior-art packaging process to be "aseptic" within the meaning of the claims. *See Nestle USA, Inc. v. Steuben Foods, Inc.*, 686 F. App'x 917, 919 (Fed. Cir. 2017) (Ex. 1); *Nestle USA, Inc. v. Steuben Foods, Inc.*, 884 F.3d 1350, 1351 (Fed. Cir. 2018) (Ex. 2). On remand, Steuben argued to the PTO that the Federal Circuit's construction was incorrect, but the PTO regarded the court's construction as binding. *See Nestlé USA, Inc. v. Steuben Foods, Inc.*, IPR2014-01235, Paper 111 (P.T.A.B. May 8, 2019) (Ex. 3 at 11–13); *Nestlé Healthcare Nutrition, Inc. v. Steuben Foods, Inc.*, IPR2015-00249, Paper 169 (P.T.A.B. Aug. 16, 2019) (Ex. 4 at 7–8). The PTO ruled that, if the residual hydrogen peroxide requirement was not part of the term "aseptic," then the challenged claims were obvious. *See* Ex. 3 at 32; Ex. 4 at 8–9, 43. This time around, Steuben appealed to the Federal Circuit.

Rather than seeking a decision on the merits, Steuben asked the Federal Circuit for a remand on *Arthrex* grounds so that the obviousness determination would be made by a different panel of APJs. This gambit may prolong the PTO proceedings, but it is exceedingly unlikely to change their outcome. Although the Federal Circuit granted Steuben's remand motion, there is no reason to think that a new panel of APJs applying the same construction of "aseptic"

mandated by the Federal Circuit will find the challenged claims patentable. As the prior panel of APJs already found, all of the other claim limitations are found in the prior art. When the proceedings are over, the challenged claims are likely to stay dead. So a trial in this Court on the '013 and '468 patent claims that are challenged in the IPRs is not any more likely now than it was when this Court instituted the stay.

To make it appear as if Steuben's chances of prevailing have improved, Steuben observes that because the patents-in-suit have now expired, the PTO should apply the *Phillips* claim-construction standard rather than the "broadest reasonable construction" standard that it had previously applied. *See* May 22 Letter, at 3. But the change in claim-construction standards is unlikely to have any effect, for two reasons. First, the standards do not differ where, as here, the patentee acted as his own lexicographer in defining "aseptic" to mean "the FDA level of aseptic." *Nestle*, 686 F. App'x at 919 (holding that the specification's definition of "aseptic" was "a binding lexicography"). Second, the Federal Circuit has already conclusively ruled that "the FDA level of aseptic" does not require compliance with the FDA's regulations on residual hydrogen peroxide—and that construction is binding as the law of the case.

### 2. The PTO's desire for Supreme Court guidance on *Arthrex* does not justify lifting the stay.

The PTO is facing more than 100 remands from the Federal Circuit on *Arthrex* grounds, all with instructions to have new decisions issued by different panels than those who originally issued them. Because the Supreme Court has not yet passed on the Appointments Clause issue in *Arthrex* or on the Federal Circuit's remedy, the PTO has decided not to re-do all of the remanded proceedings until the Supreme Court has spoken. Accordingly, the PTO has issued a general order holding those proceedings in abeyance "until the Supreme Court acts on a petition for certiorari or the time for filing such petitions expires." General Order in Cases Remanded under *Arthrex, Inc. v. Smith & Nephew, Inc.*, 2020 WL 2119932 at *1 (P.T.A.B. May 1, 2020).

Steuben argues that the effect of the PTO's order "is to potentially indefinitely delay any consideration of claims" on remand. May 22 Letter at 3. But the key qualifier in that sentence is "potentially." Certiorari petitions in *Arthrex* are due in August, so the Supreme Court will either grant or deny certiorari this fall. If certiorari is denied, then the PTO's administrative stay will end this fall. If certiorari is granted, the Supreme Court will almost certainly issue a decision before the end of its term, meaning that the PTO's administrative stay will end no later than June of next year. The Supreme Court could rule that there is no need for a re-do, in which case the IPRs will promptly head back to the Federal Circuit for decisions on the merits. Alternatively, the Supreme Court could confirm that a re-do is needed, in which case the IPRs will restart next summer. Regardless of what the Supreme Court ultimately decides, this Court could re-evaluate the stay in light of the Supreme Court's actual decision, rather than speculating now about what the Supreme Court could potentially decide.

Although the PTO's general order putting the remanded cases on hold may add some delay at the margin, that marginal delay does not fundamentally alter the calculus underlying the stay order. The likelihood when the stay was entered, as now, is that the challenged claims in the IPRs will be found unpatentable under the proper claim construction. There was then, and still is,

some small chance that one or more claims might survive the PTO proceedings and Federal Circuit appeal and so would require further proceedings in this Court. And it was apparent then and still is apparent today that the PTO proceedings and related appeals would take too long for any surviving claims to be included in the same trial as the claims that have not been stayed. Therefore, although the Federal Circuit's remand results in some additional delay, the remand does not affect the logic underlying the stay because the prospect of two trials in this case, however unlikely, was always present and is no more likely now than it was when the stay was issued.

> **3. The delay resulting from a stay will not unduly prejudice Steuben, which can be made whole with money damages if any claims survive.**

When it granted the stay, this Court determined that doing so would cause no undue prejudice to Steuben. Nothing has changed in the three intervening months that alters that conclusion.

Because the patents have expired and money damages are Steuben's only available remedy, if Steuben were to prevail at trial on any claims surviving the PTO proceedings, Steuben would suffer no undue prejudice from the delay because Steuben can be made whole with appropriate prejudgment interest. Indeed, Steuben concedes as much but, in a throwaway line, suggests that delay could cause it some unspecified evidentiary prejudice. In Steuben's own words, "While the patents are expired, and money damages could compensate Steuben, the indefinite delay exacerbates the risk that evidence will be lost." May 22 Letter at 4. Tellingly, however, Steuben identified no evidence of any kind that is at risk of being lost, no witness whose availability is in question, no documents pertinent to its case that have not already been produced and are at risk of disappearing, and no reason to think that the aseptic bottling systems accused of infringement will be taken out of service. Steuben's acknowledgment that it can be made whole with money damages, coupled with its failure to come forward with any facts supporting its assertion of prejudice, means that Steuben cannot meet its burden to justify lifting the stay.

The most likely outcome—both when the stay was put into place and still today—is that the challenged claims will *not* emerge from the PTO's administrative review process intact and that no second trial will be needed. Indeed, lifting the stay at this point would be prejudicial to Shibuya and Hood, who have been spending money litigating this case for nearly a decade and finally can stop spending money and effort litigating patent claims that should never have been issued and that the PTO is likely to eliminate. This Court should therefore leave the stay in place and let the PTO finish its work.

> **B. There has been no significant change in the status of the '013 patent reexamination.**

When this Court granted a stay of proceedings pending the outcome of the reexamination of the '013 patent, the claims of that patent stood rejected in the PTO, albeit in a non-final rejection. Since then, the PTO examiner has issued a further non-final rejection of the challenged claims. *See Inter partes* reexamination of U.S. Patent No. 6,945,013, Control No. 95/001,452, at

3 (May 1, 2020) (Ex. 5). Accordingly, there has been no substantive change in the status of the reexamination, which is proceeding through the PTO. To be clear: at the time this Court stayed proceedings on the '013 patent, the claims in reexamination stood rejected in a non-final office action; now, the claims in reexamination stand rejected in a non-final office action. No change on that score. In the most recent non-final office action, the examiner concluded that the *Phillips* construction standard did not apply to "aseptic" because the examiner had applied the Federal Circuit's construction and the "definition of 'aseptic' as 'the United States FDA level of aseptic' is binding lexicography." Ex. 5, at 19, 40. Contrary to Steuben's characterization that the reexamination is "back to square one after 10 years," the recent non-final office action confirms that the circumstances remain unchanged as to the claims of the '013 patent.

While Steuben never tires of pointing out that claim 20 of the '013 patent was not deemed unpatentable in a prior IPR proceeding, Steuben also concedes, as it must, that the prior art before the examiner in the pending reexamination is different from the art that was relied upon by the petitioner in the IPR. And although there is some uncertainty as to how long the reexamination will take, and there is some chance that it will not be concluded before the November 2021 trial, that was true when the stay was entered as well. There has been no pertinent change in the status of the reexamination.

### C. The entry of a scheduling order is not a "changed circumstance" that could justify lifting the stay.

Oddly, Steuben relies on this Court's entry of a scheduling order as a changed circumstance that ostensibly justifies lifting the stay. *See* May 22 letter at 2 ("Third, the Court has entered a trial date and schedule with trial commencing in November 2021. When the Court issued its stay order, it had not yet entered a scheduling order."). Unsurprisingly, Steuben cites no authority for the proposition that a court's entry of a scheduling order is the sort of changed circumstance that would justify lifting a stay in those proceedings—particularly when that stay was entered immediately before the entry of the scheduling order.

Presumably, Steuben's point is simply that the precise trial date was not known when the stay was entered. The approximate duration of this case was known, however, as was the risk that, if any claims subject to PTO challenge survived, further proceedings in this case might be needed after the trial on the first three patents. Indeed, the possibility of further, later proceedings in this Court was inherent in the Court's decision to stay proceedings because the need for further proceedings in this Court would depend on the outcome of PTO proceedings. Since the stay was entered, nothing has changed in a way that makes a second trial more likely. Indeed, Steuben's invocation of the entry of the scheduling order as a changed circumstance simply underscores the fact that there has been no pertinent change in circumstances that would justify lifting the stay.

While Steuben asserts that it would be inefficient to have two trials in this case if any of the claims being challenged in the PTO were to survive, Steuben ignores that the PTO proceedings and any resulting appeals would likely clarify the issues to be decided in this Court, just as they have already clarified the scope of the term "aseptic." Furthermore, as noted above, the most likely outcome is that many, and probably all, of the challenged claims will not survive

SHAW KELLER LLP
The Honorable Christopher J. Burke
Page 6

the PTO, so there will be no need for further proceedings on them in this Court. Yet, if the stay is lifted as to the '013 patent, Steuben suggests that three more terms require construction. May 22 Letter at 5 ("If the Court is inclined to revisit the stay and adopt Steuben's proposal, the parties may need to adjust their claim construction briefing to account for at most three terms."). Shibuya and Hood would need to reconfigure their current claim construction positions and briefing to accommodate the addition of these terms, which are recited in what are likely unpatentable claims. As Steuben acknowledges, the claim construction process is already underway. Steuben has already served its opening claim construction brief, which will need to be rewritten. It would doubtlessly be inefficient to expend the parties' and the Court's resources litigating and construing claims that are unlikely ever to emerge from the PTO proceedings.

### III. The Court should reject Steuben's unseemly effort to trade a narrower case for a lifting of the stay.

At its core, Steuben's letter is not a genuine effort to demonstrate changed circumstances but an attempt to cut a deal with the Court. Steuben proposes to narrow the case by dropping three patents, but *only if* this Court lifts the stay on the '013 patent. Since Steuben has little or no prospect of getting the stay lifted through application of the usual legal standards and procedures, Steuben is attempting to sweeten the deal by offering the Court the prospect of less work.

Steuben's willingness to eliminate the '468, '435, and '591 patents from the case signals a tacit admission that its positions on these patents are weak. But if Steuben were genuinely interested in streamlining the case by dismissing weak claims, it would do so *without* conditioning its dismissal on this Court's lifting of the stay on the '013 patent. Steuben could drop these weak patents at any time, thereby saving all concerned a lot of time and effort and reducing its own risk of paying attorneys' fees for an exceptional case under 35 U.S.C. § 285.

From Shibuya and Hood's point of view, Steuben's refusal to eliminate weak claims from the case unless the Court lifts the stay on the '013 patent is a thinly veiled threat: Steuben will inflict on Shibuya and Hood and on this Court the burden and expense of litigating claims that have little or no chance of success unless the Court indulges Steuben's desire to litigate the '013 patent right away, before the PTO kills off Steuben's favorite patent claims. Although Shibuya and Hood would welcome a narrowing of the case, they have refused to give in to Steuben's threats, so they oppose the lifting of the stay. This Court should likewise refuse to reward Steuben's crass bargaining tactics and should decline to lift the stay because, under the applicable legal standards, changed circumstances do not warrant a lifting of the stay.

Respectfully,

*/s/ Karen E. Keller*

Karen E. Keller (No. 4489)

cc: Clerk of the Court (via CM/ECF)
All Counsel of Record (via electronic mail)