# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| STEUBEN FOODS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:19-cv-02181-CFC-CJB |
| | ) | |
| SHIBUYA HOPPMANN CORP., | ) | |
| SHIBUYA KOGYO CO., LTD., and | ) | |
| HP HOOD LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## JOINT CLAIM CONSTRUCTION BRIEF

Dated: July 22, 2020

DEVLIN LAW FIRM LLC
Timothy Devlin (No. 4241)
1526 Gilpin Avenue
Wilmington, DE 19806
(302) 449-9010
tdevlin@devlinlawfirm.com

*Attorneys for Plaintiff*
*Steuben Foods, Inc.*

SHAW KELLER LLP
Karen E. Keller (No. 4489)
Jeff Castellano (No. 4837)
Nathan R. Hoeschen (No. 6232)
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
jcastellano@shawkeller.com
nhoeschen@shawkeller.com

*Attorneys for Defendants Shibuya*
*Hoppmann Corporation, Shibuya*
*Kogyo Co., Ltd., and HP Hood LLC*

# TABLE OF CONTENTS

I.    AGREED-UPON CONSTRUCTIONS..................................................1

II.   DISPUTED CONSTRUCTIONS .......................................................1

   A.   Introduction............................................................................1

     1.   Steuben's Opening Brief.................................................1

     2.   Defendants' Answering Brief .........................................3

     3.   Steuben's Reply Brief ...................................................4

III.  CLAIM CONSTRUCTIONS..........................................................5

   A.   The "aseptic" terms ................................................................5

     1.   "aseptic" ........................................................................5

       a.   Steuben's Opening Brief.........................................6

         (1)   The proper construction of "aseptic"...............6

         (2)   Claims that recite "aseptic" are not indefinite .................7

       b.   Defendants' Answering Brief..................................8

         (1)   The aseptic terms are indefinite........................8

         (a)   The patents define "aseptic" as "FDA level of aseptic," rendering the scope of the claims uncertain. ..........................................8

         (b)   The Federal Circuit has held that "FDA level of aseptic" does not include the limit in 28 C.F.R. §178.1005(d) for residual levels of hydrogen peroxide. ..................................11

       c.   Steuben's Reply Brief...........................................13

         (1)   The "aseptic" terms are not indefinite. ...........13

         (2)   21 C.F.R. §178.1005 is a regulation related to aseptic packaging. 16

       d.   Defendants' Sur-Reply..........................................20

         (1)   The aseptic terms are indefinite........................20

         (a)   A POSA could not define "FDA level of aseptic." ........................20

         (b)   The Federal Circuit held that "FDA level of aseptic" does not include §178.1005. ..................................22

     2.   "aseptically disinfecting"..............................................23

      a.   Steuben's Opening Brief......................................................23

      b.   Defendants' Answering Brief ..............................................30

      c.   Steuben's Reply Brief........................................................32

  3.   "aseptically sterilized foodstuffs".............................................32

      a.   Steuben's Opening Brief......................................................33

      b.   Defendants' Answering Brief ..............................................33

      c.   Steuben's Reply Brief........................................................34

  4.   "aseptically bottling"...............................................................34

      a.   Steuben's Opening Brief......................................................34

      b.   Defendants' Answering Brief ..............................................35

      c.   Steuben's Reply Brief........................................................35

B.   Means-Plus-Function Terms............................................................36

  1.   "means for providing a plurality of bottles" / "means for providing a plurality of bottles, the means include a bottle infeed" ...................................36

      a.   Steuben's Opening Brief......................................................36

         (1)   Function ..................................................................36

         (2)   Structure ................................................................37

      b.   Defendants' Answering Brief ..............................................38

         (1)   Function ..................................................................38

         (2)   Structure ................................................................38

      c.   Steuben's Reply Brief........................................................42

      d.   Defendants' Sur-Reply.......................................................44

  2.   "means for [aseptically] filling the aseptically disinfected plurality of bottles at a rate greater than 100 bottles per minute" .....................................45

      a.   Steuben's Opening Brief......................................................46

         (1)   Function ..................................................................46

         (2)   Structure ................................................................46

      b.   Defendants' Answering Brief ..............................................48

         (1)   Function ..................................................................48

(2)    Structure ................................................................48

    c.    Steuben's Reply Brief ................................................52

    d.    Defendants' Sur-Reply ..............................................53

3.    "means for aseptically disinfecting the plurality of bottles" .................54

    a.    Steuben's Opening Brief ............................................56

      (1)    Function ........................................................56

      (2)    Structure .......................................................56

    b.    Defendants' Answering Brief .....................................58

    c.    Steuben's Reply Brief ................................................62

    d.    Defendants' Sur-Reply ..............................................64

4.    "control system for controlling aseptic bottling conditions" ..................65

    a.    Steuben's Opening Brief ............................................67

    b.    Defendants' Answering Brief .....................................68

    c.    Steuben's Reply Brief ................................................71

    d.    Defendants' Sur-Reply ..............................................73

C.    Other Terms ....................................................................74

1.    "at a rate greater than 100 bottles per minute" / "rate of more than 350 bottles per minute" ...............................................................74

    a.    Steuben's Opening Brief ............................................74

    b.    Defendants' Answering Brief .....................................76

    c.    Steuben's Reply Brief ................................................77

    d.    Defendants' Sur-Reply ..............................................78

2.    "in a single production line" .................................................79

    a.    Steuben's Opening Brief ............................................79

    b.    Defendants' Answering Brief .....................................80

    c.    Steuben's Reply Brief ................................................81

    d.    Defendants' Sur-Reply ..............................................82

3.    "first sterile region surrounding a region where the product exits the valve" ............................................................................83

    a.   Steuben's Opening Brief ............................................................83

    b.   Defendants' Answering Brief ..................................................83

    c.   Steuben's Reply Brief ............................................................84

    d.   Defendants' Sur-Reply ...........................................................84

4.    "a second sterile region positioned proximate said first sterile region" ..85

    a.   Steuben's Opening Brief ............................................................85

    b.   Defendants' Answering Brief ..................................................85

    c.   Steuben's Reply Brief ............................................................86

    d.   Defendants' Sur-Reply ...........................................................86

5.    "a valve activation mechanism for controlling the opening or closing of the valve by extending a portion of the valve from the second sterile region into the first sterile region, such that the valve does not contact the bottle, and by retracting the portion of the valve from the first sterile region back into the second sterile region" ...................................................................87

    a.   Steuben's Opening Brief ............................................................87

    b.   Defendants' Answering Brief ..................................................88

    c.   Steuben's Reply Brief ............................................................91

    d.   Defendants' Sur-Reply ...........................................................92

6.    "at least about a 6 log reduction in spore organisms" ............................93

    a.   Steuben's Opening Brief ............................................................93

    b.   Defendants' Answering Brief ..................................................94

    c.   Steuben's Reply Brief ............................................................95

    d.   Defendants' Sur-Reply ...........................................................96

7.    "first supply source of sterile air," "second supply source . . . of . . . sterile air," and "third supply source of . . . sterile . . . air" ............................96

    a.   Steuben's Opening Brief ............................................................97

    b.   Defendants' Answering Brief ..................................................97

    c.   Steuben's Reply Brief ............................................................101

    d.   Defendants' Sur-Reply ...........................................................102

8.    "hot" (i.e. "hot sterile air" and "hot sterile drying air") ........................104

a.   Steuben's Opening Brief ................................................................. 105

b.   Defendants' Answering Brief ........................................................ 105

c.   Steuben's Reply Brief .................................................................... 108

d.   Defendants' Sur-Reply .................................................................. 111

D.   Conclusion ............................................................................................. 112

a.   Defendants' Answering Brief ........................................................ 112

b.   Defendants' Sur-Reply .................................................................. 112

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Advanced Ground Info. Sys., Inc. v. Life360, Inc.*,
  830 F.3d 1341 (Fed. Cir. 2016) .........................................................70

*Allergan, Inc. v. Sandoz Inc.*,
  No. 2:09-cv-97, 2011 WL 1599049 (E.D. Tex. Apr. 27, 2011) ........................14

*Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*,
  No. 14-CV-6544, 2018 WL 1525686 (E.D.N.Y. Mar. 27, 2018) .......................7

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
  314 F.3d 1313 (Fed. Cir. 2003) ...................................................80, 81

*United States v. An Article of Food*,
  752 F.2d 11 (1st Cir. 1985).......................................................29, 30

*ArcelorMittal France v. AK Steel Corp.*,
  786 F.3d 885 (Fed. Cir. 2015) ...............................................13, 18, 26

*Asyst Techs., Inc. v. Empak, Inc.*,
  268 F.3d 1364 (Fed. Cir. 2001) ............................................37, 53, 63

*BASF Corp. v. Johnson Matthey Inc.*,
  875 F.3d 1360 (Fed. Cir. 2017) .......................................................78

*Biosig Instruments, Inc. v. Nautilus, Inc.*,
  715 F.3d 891 (Fed. Cir. 2013) (abrogated in part on other grounds) ................78

*Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*,
  528 F. Supp. 2d 967 (N.D. Cal. 2007).........................................16, 22

*Bicon, Inc. v. Straumann Co.*,
  441 F.3d 945 (Fed. Cir. 2006) .......................................................32

*Blonder-Tongue Labs., Inc. v. University of Illinois Foundation*,
  402 U.S. 313 (1971)..................................................................19

*In re Certain Rotating 3-D Lidar Devices*,
  Inv. No. 337-TA-1173, 2020 WL 3833104 (USITC Apr. 30, 2020) ................78

*Cohesive Techs., Inc. v. Waters Corp.*,
  543 F.3d 1351 (Fed. Cir. 2008) ...........................................................................93

*Collaborative Agreements, LLC v. Adobe Sys. Inc.*,
  No. 15-CV-03853-EMC, 2015 WL 7753293 (N.D. Cal. Dec. 2,
  2015) ....................................................................................................................68

*Compagnie Des Bauxites de Guinee v. L'Union Atlantique S.A.
  d'Assurances*,
  723 F.2d 357 (3d Cir. 1983) ...............................................................................19

*Continental Circuits LLC v. Intel Corp.*,
  915 F.3d 788 (Fed. Cir. 2019) .............................................................................88

*Dayco Prods., Inc. v. Total Containment, Inc.*,
  258 F.3d 1317 (Fed. Cir. 2001) ...........................................................................75

*Digital-Vending Services Intern., LLC v. Univ. of Phoenix, Inc.*,
  672 F.3d 1270 (Fed. Cir. 2012) ...........................................................................32

*E-Pass Techs., Inc. v. 3Com Corp.*,
  343 F.3d 1364 (Fed. Cir. 2003) ....................................................................92, 93

*e.Digital Corp. v. Futurewei Techs., Inc.*,
  772 F.3d 723 (Fed. Cir. 2014) .............................................................................12

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*,
  879 F.3d 1332 (Fed. Cir. 2018) .........................................................................111

*Genband USA LLC v. Metaswitch Networks Ltd.*,
  2015 WL 1518007 (E.D. Tex. Apr. 2, 2015).......................................................73

*Generation II Orthotics, Inc. v. Med. Tech., Inc.*,
  263 F.3d 1356 (Fed. Cir. 2001) ...........................................................................36

*Greenberg v. Ethicon Endo-Surgery, Inc.*,
  91 F.3d 1580 (Fed. Cir. 1996) .............................................................................68

*Guangdong Alison Hi-Tech Co. v. ITC*,
  936 F.3d 1353 (Fed. Cir. 2019) ................................................................110, 111

*Hamilton v. Leavy*,
  322 F.3d 776 (3d Cir. 2003) ..........................................................25, 30

*Harris Corp. v. Ericsson Inc.*,
  417 F.3d 1241 (Fed. Cir. 2005) .............................................................63

*Intellectual Ventures II LLC v. BITCO Gen. Ins. Corp.*,
  No. 6:15-CV-59, 2016 WL 125594 (E.D. Tex. Jan. 11, 2016) .........................72

*Interval Licensing LLC v. AOL, Inc.*,
  766 F.3d 1364 (Fed. Cir. 2014) .........................................................108

*J&M Corp. v. Harley-Davidson, Inc.*,
  269 F.3d 1360 (Fed. Cir. 2001) .....................................................51, 62

*Kinzenbaw v. Case LLC*,
  179 F. App'x 20 (Fed. Cir. 2006) ..........................................................37

*Media Rights Techs., Inc. v. Capital One Financial Corp.*,
  800 F.3d 1366 (Fed. Cir. 2015) ............................................10, 70, 95

*Microsoft Corp. v. i4i Ltd. P'ship*,
  564 U.S. 91 (2011).............................................................................7

*United States v. Moored*,
  38 F.3d 1419 (6th Cir. 1994) .............................................................25

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014)..........................................................7, 11, 106

*Nestlé USA, Inc. v. Steuben Foods, Inc.*,
  686 F. App'x 917 (Fed. Cir. 2017) (unpublished)......................................*passim*

*Nestlé USA, Inc. v. Steuben Foods, Inc.*,
  884 F.3d 1350 (Fed. Cir. 2018) ....................................................6, 12

*Northrop Grumman Corp. v. Intel Corp.*,
  325 F.3d 1346 (Fed. Cir. 2003) ............................................................57

*Odetics, Inc. v. Storage Tech. Corp.*,
  185 F.3d 1259 (Fed. Cir. 1999) ...........................................43, 73, 74

*Omega Eng'g, Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) ........................................................77

*PC Connector Sols. LLC v. SmartDisk Corp.*,
  406 F.3d 1359 (Fed. Cir. 2005) ........................................................11

*Phillips. SkyHawke Techs., LLC v. Deca Int'l Corp.*,
  828 F.3d 1373 (Fed. Cir. 2016) ........................................................20

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ...............................................*passim*

*Positive Techs., Inc. v. Sony Elecs., Inc.*,
  No. C-11-02226, 2012 WL 2589921 (N.D. Cal. July 3, 2012) .............42, 44, 45

*In re Recreative Techs. Corp.*,
  83 F.3d 1394 (Fed. Cir. 1996) ........................................................108

*Seachange Int'l, Inc. v. C-COR, Inc.*,
  413 F.3d 1361 (Fed. Cir. 2005) ........................................................45

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*,
  844 F.3d 1370 (Fed. Cir. 2017) ...............................................*passim*

*Sprint Commc'ns Co., L.P. v. Charter Commc'ns, Inc.*,
  No. 1:17-CV-01734-RGA, 2019 WL 1082067 (D. Del. Mar. 7, 2019) ........................................................75, 88

*SPX Corp. v. Bartec USA, LLC*,
  557 F. Supp. 2d 810 (E.D. Mich. 2008) ..........................................73

*Steuben Foods, Inc. v. GEA Process Eng'g, Inc.*,
  243 F.Supp.3d 377 (W.D.N.Y. 2017).........................................91, 92

*Steuben Foods, Inc. v. GEA Process Eng'g, Inc. S.p.A.*,
  No. 12-cv-00904, 2016 WL 11258225 (W.D.N.Y. Aug. 26, 2016).......88, 90, 93

*Steuben Foods, Inc. v. Oystar Grp.*,
  1:10-cv-00780-EAW-JJM, D.I. 373 (W.D.N.Y. Mar. 16, 2020) ................75, 77

*Steuben Foods, Inc. v. Oystar Grp.*,
  No. 1:10-CV-00780, 2018 WL 1891470 (W.D.N.Y. Apr. 20, 2018) ................10

*Thorner v. Sony Comput. Entm't Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012) ...................................................92, 112

*Verint Sys. Inc. v. Red Box Recorders Ltd.*,
   166 F. Supp. 3d 364 (S.D.N.Y. 2016) .......................................68, 69

*Vivid Techs. Inc. v. Am. Sci. & Eng'g Co.*,
   200 F.3d 795 (Fed. Cir. 1999) ....................................................86, 87

*Wenger Mfg. v. Coating Mach. Sys., Inc.*,
   239 F.3d 1225 (Fed. Cir. 2001) ...........................................38, 57, 58

*Wi-LAN USA, Inc. v. Apple Inc.*,
   830 F.3d 1374 (Fed. Cir. 2016) ........................................................81

*Williamson v. Citrix Online, LLC*,
   792 F.3d 1339 (Fed. Cir. 2015) (en banc) ...................................68, 69

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,
   442 F.3d 1322 (Fed. Cir. 2006) ........................................................79

**Statutes**

21 U.S.C. § 348 .........................................................................27, 28, 29

35 U.S.C. § 112, ¶ 6 ...........................................................................*passim*

35 U.S.C. § 311(b) ...................................................................................9

**Other Authorities**

21 C.F.R. §113 ........................................ 14, 19, 24, 27, 28, 31, 33, 35

21 C.F.R. § 173.315 ...............................................................................28

21 C.F.R. §178.1005 ....................................................................*passim*

21 C.F.R. § 184.1366 .............................................................................28

FDA's "Guide to Inspections of Aseptic Processing and Packaging for the Food Industry" ...............................................................................72

## I.   AGREED-UPON CONSTRUCTIONS

| Claim Term | Joint Proposed Construction |
|---|---|
| "means for aseptically filling the aseptically disinfected plurality of bottles with the aseptically sterilized foodstuffs"/ "means for aseptically filling the aseptically disinfected plurality of bottles with the aseptically sterilized foodstuffs including a plurality of filling nozzles"<br><br>'188 patent:<br>claims 19, 26, 28, 30, 39 | This term is governed by 35 U.S.C. § 112, ¶ 6.<br><br>Function: aseptically filling the aseptically disinfected plurality of bottles with aseptically sterilized foodstuffs.<br><br>Structure: filling valves and filling nozzles. |
| "intermittently added"<br><br>'985 patent: claims 1, 3, 7 | Added in a non-continuous manner. |

## II.   DISPUTED CONSTRUCTIONS

### A.   Introduction

#### 1.   Steuben's Opening Brief

Plaintiff Steuben Foods, Inc. is a family-owned low acid aseptic contract manufacturer based in Elma, New York.  During its thirty-year existence, Steuben

1

has grown from a small production plant to employing over 600 people, providing manufacturing jobs to the citizens of Western New York.[1]

Aseptic packaging involves the packaging of sterile food into a sterile package in a sterile environment. This process allows foodstuffs that would otherwise need to be refrigerated (*e.g.*, milk) to be sold in "shelf stable" format, *i.e.*, without refrigeration. In the late 1990s, Steuben saw an opportunity to expand its aseptic packaging capabilities to sterilizing and filling plastic bottles. Bottles pose particular difficulty with respect to sterilization given the narrow opening at the top.

Steuben's lead engineer and a named inventor, Tom Taggart, began a search for a low acid aseptic bottle filler that could comply with the FDA regulations governing aseptic packaging at a commercially viable throughput. Given the strict FDA regulations governing aseptic packaging, Mr. Taggart determined that the European packaging equipment on the market at the time would not be suitable for use in the United States.

Mr. Taggart then embarked on a mission to design an aseptic bottle filler that could meet the stringent FDA regulations governing aseptic packaging at a high throughput. Steuben filed for patent protection directed to the methods and

---

[1] The parties previously briefed claim construction in the United States District Court for the Western District of New York ("WDNY"). Steuben cites herein to certain expert declarations prepared in connection with that prior briefing.

apparatus invented by Mr. Taggart.  The patents-in-suit disclose and claim those inventions.

Steuben presents its proposed construction for various claim terms from those patents-in-suit.  Steuben's proposed constructions are consistent with the law of claim construction and based on the intrinsic record.  Conversely, Defendants' proposed constructions are based on a litigation driven interpretation of the patents and act as a proxy for various noninfringement and invalidity arguments.  Steuben respectfully submits that the Court should adopt its proposed constructions and reject those presented by Defendants.

## 2.    Defendants' Answering Brief

Thomas Taggart, the named inventor (or co-inventor) on the patents-in-suit, did not invent aseptic packaging, which had been around for years before he applied for any patents. In the patents-in-suit, Taggart described one, specific method and apparatus to sterilize bottles and fill them with foodstuffs, although he never built a working version of the machine. *See* Ex. K, Taggart Tr. 25:7-16.

Through claim construction, Steuben seeks to broaden the patents-in-suit to cover far more than the specific method and apparatus that Taggart disclosed. And while patent claims need not be limited in scope to the preferred embodiments in the specification, claim terms do need to be understood in the context of the particular patent to which they belong. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 ("We

cannot look at the ordinary meaning of the term ... in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). Defendants (collectively, "Shibuya") propose constructions that make sense in the context of the intrinsic and extrinsic evidence; Steuben's constructions do not.

### 3.    Steuben's Reply Brief

The Court should reject Shibuya's arguments concerning the "aseptic" terms because they ask the Court to depart from the Federal Circuit's construction of "aseptic."  Steuben respectfully submits that this Court should adopt the Federal Circuit's construction of "aseptic" without Shibuya's proposed modifications.

Shibuya tried, but failed, to invalidate the '591 and '985 patents through reexamination.  Accordingly, Shibuya's claim construction positions represent its second attempt to escape infringement.  But claim construction is driven by the plain meaning of the claims as viewed by a POSITA—not a defendant's attempts to avoid infringement after having failed to invalidate a patent.[2]

---

[2] Shibuya notes that Mr. Taggart never himself built a version of the preferred embodiment.  Steuben has, however, licensed Shibuya's competitor Stork, and Stork constructed a machine for Steuben, which Steuben uses to practice Mr. Taggart's inventions.  Moreover, Steuben licensed Shibuya's customer Abbott, and Abbott used that license to have Shibuya construct machines that practice Mr. Taggart's inventions.

Shibuya's arguments concerning the means-plus-function claim terms of the

'188 patent also fail because Shibuya identifies structure well beyond that which is

necessary to perform the claimed function.  Indeed, Shibuya does not even argue

that the structure it has identified is necessary to perform the claimed function.  The

law, however, is clear that only the structure that is necessary to perform the claimed

function is proper structure under 35 U.S.C. § 112, ¶ 6.

## III.   CLAIM CONSTRUCTIONS

### A.   The "aseptic" terms

#### 1.   "aseptic"

| Steuben's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Not indefinite;<br><br>The United States FDA level of aseptic, which is confined to FDA regulations related to/governing aseptic packaging. | Indefinite;<br><br>If not indefinite, no standalone construction required because "aseptic" and its various forms (e.g., "aseptically") are construed herein in the context of the full claim terms (e.g., "aseptically disinfecting," "aseptically filling") as needed.<br><br>Alternatively, "The FDA level of aseptic, as reflected in FDA regulations governing aseptic packaging, which do not include FDA's regulations governing the amount of hydrogen peroxide residue that is permitted on foodstuff containers." |

### a. Steuben's Opening Brief

### (1)    The proper construction of "aseptic"

In connection with various *inter partes* reviews directed to the Steuben patents, the Federal Circuit has confirmed that the patents-in-suit include "binding lexicography" as to the term "aseptic." *Nestlé USA, Inc. v. Steuben Foods, Inc.*, 686 F. App'x 917, 919 (Fed. Cir. 2017) (unpublished) ("*Nestlé I*").  In particular, "the specification twice defines the term 'aseptic' as the United States 'FDA level of aseptic.'"  *Id*.  The Federal Circuit explained that the "FDA level of aseptic" is "confine[d] . . . to FDA regulations related to aseptic packaging" and that "the scope of 'aseptic' cannot include regulations that apply to foods that are not aseptically packaged." *Id*.

In a second opinion issued in connection with another *inter partes* review, the Federal Circuit confirmed that the patents use "the term 'aseptic' (or its related variation 'aseptically disinfecting') in a similar fashion." *Nestlé USA, Inc. v. Steuben Foods, Inc.*, 884 F.3d 1350, 1351 (Fed. Cir. 2018) ("*Nestlé II*").  The Federal Circuit also identified various other "aseptic" terms (*e.g.*, "aseptic product" and "aseptically filling") as being governed by the lexicographic definition of "aseptic" set forth in the patents.  *Id*.

The lexicographic definition of "aseptic" recognized by the Federal Circuit governs the construction of the aseptic terms here.  The parties have identified a

number of "aseptic" terms for construction.  Steuben respectfully submits that the Court need only adopt the Federal Circuit's construction of "aseptic," which construction can then be applied to the various "aseptic" claim terms.

For example, applying the Federal Circuit's construction of "aseptic" to "aseptically disinfecting" would result in that term requiring disinfecting in compliance with the FDA level of aseptic, i.e., the "FDA regulations related to aseptic packaging."  In that way, adopting the Federal Circuit's construction of "aseptic" will simplify the Court's task and provide the parties with the legal metes and bounds of the "aseptic" claim terms.

### (2)    Claims that recite "aseptic" are not indefinite

It is Defendants' burden by clear and convincing evidence to demonstrate that the scope of the "aseptic" claims cannot be understood with reasonable certainty. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 912 & n.10 (2014).  Steuben is not required to prove its patents are definite given the presumption of validity and will respond to Defendants' argument to the extent they make it.  *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011).

That said, Defendants will be unable to carry their burden for at least two related reasons.  First, the Federal Circuit has construed "aseptic" and therefore the scope of the claims is capable of being understood with reasonable certainty.  *See Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*, No. 14-CV-6544, 2018

WL 1525686, at *15 (E.D.N.Y. Mar. 27, 2018) ("Defendant does not explain how the court and PTAB were both able to construe these terms, yet any reasonable finder of fact must conclude that they are indefinite on a clear and convincing evidence standard.").

Second, Defendants had no difficulty in understanding the scope of the "aseptic" terms when they filed requests for reexamination directed to certain of the patents-in-suit. *See, e.g.*, *Sonix Tech. Co. v. Publ'ns Int'l, Ltd*., 844 F.3d 1370, 1379 (Fed. Cir. 2017) (reversing summary judgment of invalidity based on indefiniteness and finding it "compelling" that "[n]o one involved in either the first or the second reexamination had any apparent difficulty in determining the scope of [the claim term]").

### b. Defendants' Answering Brief

#### (1)   The aseptic terms are indefinite.

##### (a)   The patents define "aseptic" as "FDA level of aseptic," rendering the scope of the claims uncertain.

The patents-in-suit recite various "aseptic" terms, and the patents define "aseptic" to mean "the United States FDA level of aseptic." *See, e.g.,* '188 patent, 1:65-67, 4:26-27; '591 patent, 2:27-29, 4:29-30; '985 patent 2:29-31, 4:46-47. In construing these terms, the Federal Circuit has held this definition to be "binding lexicography." *Nestle USA, Inc. v. Steuben Foods, Inc.*, 686 F. App'x 917, 919 (Fed.

Cir. 2017) ("*Nestlé I*"). But the scope of "FDA level of aseptic" is not reasonably certain, so the claims containing "aseptic" and its variants are indefinite—an issue that the Federal Circuit did not address.[3]

The "FDA level of aseptic" is indefinite for at least three reasons.

*First*, there is no known "FDA level of aseptic." The FDA has not specified what level of spore reduction an aseptic system must achieve. Instead, Steuben's expert Dr. Sastry conceded that whether a particular bottling line meets the FDA level of aseptic cannot be predicted in advance because the FDA weighs unspecified criteria in an unknown manner:

> Q. So how does the FDA know if commercial sterility has been achieved?
>
> A. This is a process through -- there's a process filing, which is often conducted by -- typically conducted by a processing authority, who would provide FDA with the necessary evidence. And the FDA would consider that, and weigh that against their knowledge, and come up with the determination of whether it has been achieved.

Ex. A, Sastry Tr. 42:1-10 (objection omitted). Not until the FDA issues a decision can an applicant know whether its machine meets (or avoids, in the case one wishing to stay clear of infringement) the FDA level of aseptic. *Id.* 42:1-50:16; *see also id.* 56:2-57:9.

---

[3] The Federal Circuit appeal was from an IPR proceeding, and indefiniteness may not be raised as a ground of invalidity in IPRs. *See* 35 U.S.C. § 311(b) (limiting IPR invalidity grounds to anticipation and obviousness).

*Second*, it is not clear which FDA regulations govern the "FDA level of aseptic." *See infra* at 25. The Federal Circuit has determined that "FDA level of aseptic" "cannot include regulations that apply to foods that are not aseptically packaged." *Nestle I*, 686 F. App'x at 919. In particular, Title 21 C.F.R. § 178.1005(d) (governing acceptable levels of residual hydrogen peroxide on packaging) is not among the regulations that define FDA level of aseptic. *Id.* Remarkably, Steuben does not accept that Federal Circuit holding and asks this Court to depart from it in ruling on this issue. *See infra* Section II.A.(1)(b) The residual hydrogen peroxide limit of 21 C.F.R. § 178.1005(d) is just one FDA regulation among thousands, and—as Steuben's continued resistance to the Federal Circuit's ruling shows—it is not reasonably certain which regulations must be satisfied to meet the "FDA level of aseptic."

*Third*, FDA requirements change over time. For example, when the patent application was filed, oxonia was not an FDA-approved sterilant for aseptic packaging, but now it is. *Steuben Foods, Inc. v. Oystar Grp.*, No. 1:10-CV-00780, 2018 WL 1891470, at *2 (W.D.N.Y. Apr. 20, 2018). So a system that used oxonia as a sterilant could not infringe when the patent applications were filed but might infringe today. This susceptibility to change renders the term indefinite because a patent "claim cannot have different meanings at different times." *Media Rights Techs., Inc. v. Capital One Financial Corp.*, 800 F.3d 1366, 1371 (Fed. Cir. 2015);

*accord PC Connector Sols. LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1363 (Fed. Cir. 2005).

The public has a right to know with reasonable certainty which activities are permitted and which are potentially infringing. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 899 (2014) ("a patent must be precise enough to afford clear notice of what is claimed, thereby appris[ing] the public of what is still open to them.") (citations and internal quotations omitted). The asserted claims containing the "aseptic" terms fail that test and are therefore invalid as indefinite.

> **(b)    The Federal Circuit has held that "FDA level of aseptic" does not include the limit in 28 C.F.R. §178.1005(d) for residual levels of hydrogen peroxide.**

The Federal Circuit has already ruled that "FDA level of aseptic" does not include 28 C.F.R. § 178.1005(d), which limits the hydrogen peroxide residue on food packaging to 0.5 parts per million (ppm). *Nestle I*, 686 F. App'x at 919. The Federal Circuit noted that "[w]here the patentee wished to claim embodiments requiring less than 0.5 ppm of hydrogen peroxide residue, it did so using express language." *Id.*; *see also, e.g.*, '188 patent, Claim 22. Nevertheless, Steuben asks this Court to depart from that holding. *Infra* at 26-27.

The Federal Circuit's decision came in the context of IPR proceedings in which Steuben argued that "FDA level of aseptic" required compliance not only with

FDA regulations limiting the number of microorganisms that can remain on the packaging after disinfection, but also with regulations limiting the amount of hydrogen peroxide that can remain on the packaging after rinsing. Because the prior art before the PTO did not address the precise residual-hydrogen-peroxide amounts in the FDA's regulations, the PTO initially found that the prior art did not render the claims obvious.

On appeal, however, the Federal Circuit ruled that "FDA level of aseptic" did *not* include compliance with the FDA's regulations governing the amount of residual hydrogen peroxide on the package. *See Nestle I*, 686 F. App'x 917; *accord Nestle USA, Inc. v. Steuben Foods, Inc*., 884 F.3d 1350, 1351 (Fed. Cir. 2018). On remand, applying the correct claim construction, the PTO issued a final written decision that, because the residual-hydrogen-peroxide requirement was not part of the term "aseptic," the challenged claims were obvious. *See* Ex. B, Final Written Decision of IPR2014-01235, at 8-9, 32, 43.

Issue preclusion prevents Steuben from re-litigating the Federal Circuit's claim construction decision in this Court. *e.Digital Corp. v. Futurewei Techs., Inc.*, 772 F.3d 723, 726 (Fed. Cir. 2014) (affirming district court's application of collateral estoppel to identical claim construction inquiry decided in an earlier action).

Steuben would have this Court depart from the Federal Circuit's claim construction because Steuben's experts have offered conclusory opinions that "FDA

level of aseptic" includes § 178.1005(d). But these biased opinions are far from the "extraordinary circumstances" required to deviate from a mandate from the Federal Circuit. *ArcelorMittal France v. AK Steel Corp.*, 786 F.3d 885, 889 (Fed. Cir. 2015) ("such departures are rare"). Steuben provides no compelling reason to disturb the Federal Circuit's construction—it merely presents opinions from its own paid, non-lawyer experts, who disagree with the Federal Circuit's interpretation of FDA regulations. This Court should follow the Federal Circuit's ruling that "FDA level of aseptic" does not require compliance with 28 C.F.R. § 178.1005(d).

### c. Steuben's Reply Brief

#### (1)   The "aseptic" terms are not indefinite.

Shibuya has not carried its burden by clear and convincing evidence to demonstrate that the "aseptic" claims are indefinite. Indeed, Shibuya has submitted no evidence from the perspective of a POSITA as to this issue. Shibuya's attorney-argument-based indefiniteness challenge fails.

The Federal Circuit has held that "aseptic" is defined according to "binding lexicography" to mean the "FDA level of aseptic," which is confined to the FDA regulations governing/relating to aseptic packaging. *Nestlé I*, 686 F. App'x at 918-19. The Federal Circuit also explained that if a regulation applies to all foods regardless of whether they are aseptically packaged, then it is not part of the FDA level of aseptic. *Id*. at 919. If a regulation exclusively applies to aseptic packaging,

then it is part of the FDA level of aseptic. *Id*. The Federal Circuit's opinion demonstrates that "aseptic" is in fact definite and provides a POSITA with a definite framework to determine (*e.g.*, in the context of infringement) which regulations qualify as part of the FDA level of aseptic.

Shibuya argues that "aseptic" is indefinite because "[t]he FDA has not specified what level of spore reduction an aseptic system must achieve." Shibuya is incorrect because the FDA requires "commercial sterility" of a container, which requires that containers be "free of viable microorganisms . . . capable of reproducing in the food under normal nonrefrigerated conditions of storage and distribution." 21 C.F.R. §113.3(e)(2). In essence, the FDA requires an absence of microorganisms. A POSITA can easily determine whether they have met this requirement by testing the bottle after sterilization to determine whether the container is free of viable microorganisms—something those in the aseptic packaging industry routinely do.

Sastry's deposition testimony does not suggest that the "aseptic" terms are indefinite. Shibuya's argument conflates the FDA level of aseptic with FDA approval. The "aseptic" claims require meeting the FDA level of aseptic, but not FDA approval. *Allergan, Inc. v. Sandoz Inc.*, No. 2:09-cv-97, 2011 WL 1599049, at *8 (E.D. Tex. Apr. 27, 2011) (finding "it would be improper to read [a drug that meets FDA standards for approval] limitation into the claims just because the

14

claimed invention must obtain FDA approval before it can be administered to a person").

FDA approval is required *to sell* low acid food products (*e.g.*, milk) in the United States without refrigeration.  But the "FDA level of aseptic" can be met without obtaining approval to sell the products without refrigeration.  A POSITA need not know with absolute certainty that the FDA will approve the selling of low acid foodstuffs without refrigeration to know with reasonable certainty that it complies with the FDA regulations governing aseptic packaging, *i.e.*, the FDA level of aseptic.

Shibuya also argues that "aseptic" is indefinite by alleging that "FDA requirements change over time," pointing to the fact that the FDA approved "oxonia" as a sterilant for use in low acid aseptic packaging after the filing date. Shibuya's argument presupposes that the FDA level of aseptic requires an FDA approved sterilant, which is does not.[4]  But, even if it did, the FDA's approval of a new sterilant does not change the requirement that the sterilant be approved.  The approval requirement remains the same; that which satisfies the requirement can change over time, which is completely appropriate under the law.  *See Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 528 F. Supp. 2d 967,

---

[4] Shibuya took the position that "aseptically disinfecting" did not require the use of an "FDA approved sterilant" in WDNY.  *See* Dkt. 442 at 11.

980 (N.D. Cal. 2007) ("The term in question may be a category, the contents of which expand over time.")

The fact that a sterilant that had not yet been approved would not have infringed a supposed requirement to use an FDA approved sterilant does not suggest "aseptic" is indefinite.  For example, if the claim recited "aseptically disinfecting with an FDA approved sterilant" (which it does not), it would not be infringed by using a sterilant that was not FDA approved.  If a POSITA wanted to avoid infringement of this hypothetical claim, they could decide not to obtain FDA approval for the sterilant.

### (2)    21 C.F.R. §178.1005 is a regulation related to aseptic packaging.

Steuben's Opening *Markman* brief explained that 21 C.F.R. § 178.1005, including subpart (d) applies exclusively to aseptic packaging.  Shibuya does not attempt to show otherwise and cannot raise such an argument for the first time in sur-reply.  Instead, Shibuya argues that "Steuben would have this Court depart from the Federal Circuit's claim construction because Steuben's experts have offered conclusory opinions that 'FDA level of aseptic' includes § 178.1005(d)."

As an initial matter, Steuben agrees that the Federal Circuit's actual construction of "aseptic" is binding on this Court under *stare decisis*.  It is Shibuya who asks the Court to depart from the Federal Circuit's claim construction by

attempting to delineate which regulations are "related to aseptic packaging," as part of the claim construction process.

Shibuya confuses the Federal Circuit's application of its claim construction with the claim construction itself. The Federal Circuit's construction limited the "FDA level of aseptic" to regulations that apply only to aseptically packaged foods. *Nestlé I*, 686 F. App'x at 919-20. It then applied that construction to the prior art and determined that, under its construction, the patent challenger in the IPR was not required to demonstrate that the prior art rendered compliance with § 178.1005(d) obvious. *Id.*

The Federal Circuit adopted Nestlé USA's argument that "*all* food processes ('aseptic' or otherwise) that apply $H_2O_2$ to food packaging must meet the FDA's residual requirement, meaning that it is not an 'aseptic' standard." Ex. 11, at 11 (original emphasis). Nestlé cited no evidence to support its assertion and did not engage in any type of regulatory analysis to arrive at its unsupported assertion.[5] Because Nestlé raised its argument after the record closed in the underlying IPR, Steuben did not have an opportunity to address the argument with evidence on a complete record.

---

[5] On remand in a related proceeding, Nestlé's expert admitted that § 178.1005 does not apply to all foodstuffs. Ex. 12 at 33:4-36:3.

Shibuya argues that the new evidence presented by Steuben, which the Federal Circuit indisputably did not consider, is "far from the 'extraordinary circumstances' required to deviate from a mandate from the Federal Circuit." But Shibuya's cited authority demonstrates that "extraordinary circumstances" are present where "new evidence differs materially from the evidence of record when the issue was first decided and . . . it provides less support for that decision." *ArcelorMittal*, 786 F.3d at 889 (internal quotation omitted). This exception to the law of the case doctrine "makes sense because when the record contains new evidence, the question has not really been decided earlier and is posed for the first time." *Id.* (internal quotations omitted). Mr. Mansour's declaration meets this standard.

Shibuya characterizes the new evidence presented by Steuben as "opinions from its own paid, non-lawyer experts," who disagree with the Federal Circuit. Contrary to Shibuya's argument, ***Mark Mansour is a regulatory lawyer and expert in FDA regulatory law***. Ex. 1, ¶¶ 1-7. Mr. Mansour's declaration carefully analyzes the various statutes and regulations at issue and concludes that §178.1005(d) does not apply to all foods as Nestlé belatedly suggested to the Federal Circuit. *Id.*, ¶¶ 17-33.

Mr. Mansour explains that "cross-referencing" between regulations "is an essential component of the FDA's regulatory regime." *Id.*, ¶ 27. Indeed, the FDA

cross-references 21 C.F.R. § 113 (the FDA's aseptic packaging specific commercial sterility regulation) in 21 C.F.R. § 178.1005(e)(1).   Mr. Mansour explains that "Paragraph(e)(1), therefore, provides that hydrogen peroxide can be used:  (1) if it complies with the specifications of Section 178.1005; and (2) for the sole purpose of attaining commercial sterility under 21 C.F.R. § 113."  *Id.*, ¶ 22.  Ultimately, Mr. Mansour explains:  "In view of the 'specific use' regulatory regime of the FDA and the cross referencing between 21 C.F.R. § 113 and 21 C.F.R. § 178.1005, it is my opinion that as a matter of regulatory law, 21 C.F.R. § 178.1005 applies exclusively to aseptic packaging."  *Id.*, ¶ 31.  This new evidence demonstrates that § 178.1005 is a regulation governing aseptic packaging.

Shibuya's issue preclusion argument fails because Steuben did not have a full and fair opportunity to litigate the issue "procedurally, substantively, and evidentially" because Nestlé raised the argument after the record was closed in the underlying IPR.  *Blonder-Tongue Labs., Inc. v. University of Illinois Foundation*, 402 U.S. 313, 333 (1971); *see also Compagnie Des Bauxites de Guinee v. L'Union Atlantique S.A. d'Assurances*, 723 F.2d 357, 361 (3d Cir. 1983).  Moreover, to the extent this Court finds that the Federal Circuit's statement concerning § 178.1005 was part of the Federal Circuit's claim construction, issue preclusion does not apply because the Federal Circuit applied the broadest reasonable interpretation standard

whereas this Court applies a narrower standard under *Phillips*. *SkyHawke Techs., LLC v. Deca Int'l Corp.*, 828 F.3d 1373, 1376 (Fed. Cir. 2016).

In fact, if the Court determines that it is appropriate to delineate which FDA regulations are part of the "FDA level of aseptic" through claim construction, § 178.1005 must be included because Steuben repeatedly argued to the PTO that the "FDA level of aseptic" requires compliance with § 178.1005(d). For example, Steuben clearly and unmistakably argued that "the term 'aseptic' must be interpreted to require the FDA level of aseptic, which in turn require[s] no more than a 0.5 ppm of residual hydrogen peroxide." Ex. 13 at 33.

### d. Defendants' Sur-Reply

#### (1)   The aseptic terms are indefinite.

##### (a)   A POSA could not define "FDA level of aseptic."

Steuben's rejoinder to whether "FDA level of aseptic" is indefinite is that "the FDA requires an absence of microorganisms … [and a] POSITA can easily determine whether they have met this requirement by testing the bottle after sterilization to determine whether the container is free of viable microorganisms—something those in the aseptic packaging industry routinely do." *Supra* at 14. This seemingly straightforward argument misses the point. Indefiniteness is about the certainty of the boundaries of claim scope, not whether a POSA could easily land in the heart of the claim. "FDA level of aseptic" lacks any defined lower bound, such

as how great a log reduction in microorganisms is needed. Accordingly, a POSA would not know with reasonable certainty whether the FDA would regard a given system to be sufficiently free of microorganisms.

The FDA has vaguely defined "commercial sterility," the boundaries of which are uncertain to a POSA.   Steuben's expert Dr. Sastry could not provide any definition for "FDA level of aseptic." *E.g.*, Ex. A at 42:1-50:16. When asked how one would know if a machine would have achieved commercial sterility, Sastry repeatedly responded that one would "have to approach FDA" and "FDA would have to look at the evidence, and render a decision." "It's the balance of evidence" that "could be weighed into consideration in deciding whether or not … how many log cycles they may be able to — to come up with." *Id.*; *see also* Ex. 19, Keener Tr. 159:16-20 ("There isn't a good definition for commercial sterility.").

Steuben argues the aseptic terms are not indefinite because the Federal Circuit held that if "a regulation exclusively applies to aseptic packaging, then it is part of the FDA level of aseptic." *Supra* at 13-14. But it is unclear which "FDA regulations [are] related to aseptic packaging." This source of certainty is laid bare by Steuben's insistence that §178.1005(d) relates exclusively to aseptic packaging despite the Federal Circuit's holding to the contrary. *Nestle USA, Inc. v. Steuben Foods, Inc.*, 686 F. App'x 917, 919 (Fed. Cir. 2017). Section 178.1005(d) is but one of thousands of regulations that could be "related to aseptic packaging" but is not. Thus, a POSA

would not know with reasonable certainty which FDA regulations fall within the scope of "FDA level of aseptic." *See id.* Moreover, the set of regulations that exclusively apply to aseptic packaging can change over time, adding to the uncertainty about the term's scope. Response at 4.[6]

> **(b)    The Federal Circuit held that "FDA level of aseptic" does not include § 178.1005.**

The Federal Circuit held that §178.1005(d) does not fall within the scope of "FDA level of aseptic" under the broadest reasonable interpretation standard, but Steuben fails to explain how the construction would change—if at all—under the *Phillips* standard.

Section 178.1005(d) limits the amount of toxic hydrogen-peroxide residue that can be present on food packaging. Steuben's argument that the regulation applies only to aseptically packaged foodstuffs, and that the FDA thus tolerates more toxic residue on non-aseptically packaged foodstuffs, is implausible on its face. In any event, Steuben is precluded by both stare decisis and collateral estoppel from arguing this because it has already lost this argument in the Federal Circuit.

---

[6] Steuben's citation of *Board of Trustees of Leland Stanford Junior University v. Roche Molecular Systems, Inc.*, 528 F. Supp. 2d 967, 980 (N.D. Cal. 2007) is inapposite. That case stands for the proposition that claims can be written to encompass anticipated future technologies. It does not suggest that claims can be written such that existing technologies that do not infringe today might infringe tomorrow.

Steuben's new-evidence argument for departing from the Federal Circuit's holding is a belated declaration from Steuben's expert saying that he disagrees with the Federal Circuit's decision. Shibuya should not be forced to relitigate an issue that has already been resolved merely because Steuben failed to adequately prosecute this issue in the first instance.

### 2.   "aseptically disinfecting"

| Steuben's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Not indefinite. "Aseptic" construed as above, no further construction necessary. To the extent further construction is required: disinfecting in compliance with the United States FDA level of aseptic (i.e., the FDA regulations governing/related to aseptic packaging). | Indefinite; Alternatively, application of heat, chemical sterilant(s), or other appropriate treatment that renders the equipment and containers free of viable microorganisms and their spores having public health significance, as well as microorganisms and spores of nonhealth significance, capable of reproducing in the food under normal nonrefrigerated conditions of storage and distribution. |

### a.  Steuben's Opening Brief

As explained immediately *supra*, "aseptically disinfecting" needs no standalone construction.  Construing "aseptic" is sufficient, and Steuben requests that the Court adopt the Federal Circuit's construction for this claim term. Defendants, on the other hand, depart from the Federal Circuit's claim construction.

Defendants propose a construction that would have the Court determine *which* regulations are part of the FDA level of aseptic during the claim construction phase. Specifically, Defendants ask the Court to read in the sterility requirements of 21 C.F.R. § 113.3(a) to the exclusion of the "FDA's regulations governing the amount of hydrogen peroxide residue that is permitted on foodstuff containers." Dkt. 515 at 3-4. The Federal Circuit did not provide an exhaustive list of regulations that are related to aseptically packaging. Instead, it left that task to the lower courts and tribunals.

Defendants' argument is based on the Federal Circuit's opinion in *Nestlé I*, where it stated: "[T]he FDA's hydrogen peroxide residue standard applies to *all* foodstuffs, regardless of whether they are aseptically packaged. Accordingly, the scope of 'aseptic' cannot include regulations that apply to foods that are not aseptically packaged." 686 F. App'x at 919. The first quoted sentence was an application of the claim construction and not part of the claim construction holding or the claim construction itself. The second quoted sentence provides guidance on how to determine which regulations are related to/governing aseptic packaging under the Federal Circuit's claim construction. As such, Defendants' claim construction argument is misplaced by seeking to import an application of the construction into the construction.

24

While the Federal Circuit's claim construction (which Steuben submits should be adopted) does not identify which specific regulations are related to or govern aseptic packaging, Defendants ask the Court to determine that now.[7]  If the Court is inclined to consider this question now, it should reject Defendants' argument and find that 21 C.F.R. § 178.1005 applies only to aseptic packaging.

A lower court can reconsider a finding of a superior court when the record contains new evidence that differs materially from the evidence of record and it provides less support for that decision.  *Hamilton v. Leavy*, 322 F.3d 776, 786–87 (3d Cir. 2003); *United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir. 1994).

The record before this Court contains new and materially different evidence. That evidence demonstrates that § 178.1005 is a regulation that applies ***exclusively*** to aseptic packaging and governs residual hydrogen peroxide ***only*** in the context of aseptic packaging.  *See, e.g.*, Ex. 1, ¶¶ 29, 35; Ex. 2, at 72-78.  As such, it does not apply to all foods regardless of whether they are aseptically packaged.  The opposite is true.

---

[7] The Federal Circuit's claim construction limits the scope of the "aseptic" claims to the FDA regulations governing aseptic packaging.  At some point, the Court may need to make a legal determination as to which regulations govern, but such a determination can be made as part of summary judgment practice where the parties will identify those regulations that are related to aseptic packaging to determine infringement and invalidity.

Before turning to the substantive reasons that § 178.1005 applies only to aseptic packaging, it is useful to understand the procedural circumstances that led to an undeveloped record at the Federal Circuit.   The Federal Circuit's residual hydrogen peroxide statement adopted a position advocated for by the petitioner's counsel in *inter partes* review after the record was closed there.  As such, there was no evidence submitted in the record as to whether 21 C.F.R. § 178.1005 applies to all foodstuffs or rather whether it applies only to aseptic packaging, and the Federal Circuit's decision cites no such evidence.

Since the time of the Federal Circuit's statement, the record has developed, which justifies this Court considering the question based on the newly developed record.  *ArcelorMittal France v. AK Steel Corp.*, 786 F.3d 885, 889 (Fed. Cir. 2015) (quoting *Hamilton*).  For example, the record now includes declaration evidence demonstrating that 21 C.F.R. § 178.1005 applies only to aseptic packaging.  This evidence was not of record when the Federal Circuit made its statement concerning hydrogen peroxide residue.

Dr. Sudhir Sastry, a professor of aseptic packaging at Ohio State University and a person of skill in the art ("POSITA"), explains that "[t]hose skilled in the art in 1999 well understood the FDA's regulatory framework governing aseptic packaging set forth in 21 C.F.R. § 113 and 21 C.F.R. § 178.1005" and that "§178.1005 does not apply to all foods regardless of whether they are aseptically

packaged." Ex. 3, Dkt. 360, ¶¶ 26, 28.  Defendants' expert Dr. Swartzel testified that it was his understanding that the FDA's aseptic packaging regulations require less than 0.5 ppm residual hydrogen peroxide in the package, which is required by § 178.1005(d).  Ex. 6 at 41:12-42:5.

The record now also includes the declaration of Mark Mansour who is an expert in the FDA's regulatory scheme.  Mr. Mansour analyzes the FDA's regulatory scheme and industry filings and explains that under the FDA's regulatory scheme, § 178.1005 "applies exclusively to aseptic packaging" and that it "is a regulation governing aseptic packaging."  Ex. 1, ¶¶ 31-32.

Mr. Mansour's conclusion is based on the fact that § 178.1005 was promulgated pursuant to 21 U.S.C. § 348, which provides the FDA with statutory authority to regulate food additives. Ex. 1, ¶¶ 14-31.  Residual sterilant is considered a food additive because it can make contact with liquid when the liquid is filled into a bottle that contains residual sterilant.

§ 348(a)(3)(A) authorizes the FDA to issue a regulation finding a food additive safe for a "*particular use*."  § 178.1005 is one such regulation, and the regulation approved the use of hydrogen peroxide for the particular and sole purpose of being used in aseptic packaging.  This is set forth on the face of the regulation, which states that "[h]ydrogen peroxide solution identified in this section may be

safely used to sterilize polymeric food-contact surfaces identified in paragraph (e)(1) of this section."

Section (e)(1) authorizes the use of hydrogen peroxide "as provided for in part 113 of this chapter. "[P]art 113" refers to 21 C.F.R. § 113, which sets forth the FDA's sterility standard that is specific to aseptic packaging. *Nestlé I*, 686 F. App'x at 919. This cross-reference makes clear that § 178.1005 authorizes hydrogen peroxide to be used only for the purpose of aseptic packaging and not for some other purpose. Indeed, the same IPR petitioner that raised the belated argument that §178.1005(d) applies to all foods later admitted that "§ 178.1005**(e)** recites 'commercial sterility' and is limited to 'aseptic packaging'" and further that 21 C.F.R. § 178.1005(e)(1) "is tied *specifically* to the FDA's 'aseptic'/'commercial sterility' requirement." Ex. 4, at 11; Ex. 5, at 8.

The FDA's use specific regulation of food additives pursuant to § 348 is further exemplified in additional FDA regulations that govern the use of hydrogen peroxide outside of aseptic packaging. For example, the FDA regulates the use of hydrogen peroxide in various contexts outside of aseptic packaging pursuant to 21 C.F.R. § 184.1366. As another example, 21 C.F.R. § 173.315 regulates the use of hydrogen peroxide in combination with acetic acid to wash fruits and vegetables.

As another example, in 2017 the FDA approved the use of hydrogen peroxide as sterilant in connection with food packaging materials intended to contact infant

formula products.  In the application submitted to the FDA for such approval, the applicant stated:

> Title 21 C.F.R. § 178.1005 ("Hydrogen peroxide") permits the use of aqueous solutions of hydrogen peroxide (up to 35%) to sterilize certain polymeric food-contact surfaces provided the concentration of hydrogen peroxide in distilled water packaged under production conditions does not exceed 0.5 parts per million (ppm).  We propose the same limitation for this FCN.

Ex. 7, at 4; Ex. 1, ¶ 35.  This demonstrates that the residual peroxide requirement of *§ 178.1005 does not apply to all uses of hydrogen peroxide*—if it did, there would be no need to propose that a newly issued approval regulating a different use of hydrogen peroxide should follow the same requirements as § 178.1005.  Ex. 1, ¶ 35; Ex. 7, at 1, 4.

The federal courts have confirmed the use specific approval of food additives under § 348.  For example, the First Circuit affirmed a finding that the government appropriately seized "three lots of bottled soft drinks" because they included a food additive—potassium nitrate—that rendered the beverages "adulterated" under § 348. *United States v. An Article of Food*, 752 F.2d 11, 13 (1st Cir. 1985).

The manufacturer of the potassium nitrate argued the food product was not "adulterated" because potassium nitrate was already permitted to be used in food. *Id.*  The court rejected this argument because the evidence "show[ed] only that potassium nitrate continues to be sanctioned by the FDA for use in curing meat. *The sanction permitting very limited use of potassium nitrate in meats cannot be*

*construed to sanction use of the same substance for an altogether different purpose in beverages*." *Id.* at 16 (emphasis added). The same principle applies here. § 178.1005 allows for the use of hydrogen peroxide only in aseptic packaging to achieve commercial sterility. Other purposes must be sanctioned by a different regulation, and they are as explained above.

While Steuben recognizes that the Court would in the normal circumstance not be inclined to revisit a finding by the Federal Circuit, it respectfully submits that it would be appropriate for this Court to consider the question of whether § 178.1005 applies to all foodstuffs based on a developed record. When the Federal Circuit made its statement concerning the FDA's hydrogen peroxide residue standard, it did not have before it a full record on the issue. *See Hamilton*, 322 F.3d at 786-87.

This Court is the first Court to consider the question of § 178.1005's application to areas other than aseptic packaging on a developed record. For that reason, Steuben respectfully submits that this Court should determine that §178.1005 applies only to aseptic packaging based on the developed record before it.

## b. Defendants' Answering Brief

Steuben attempts to smuggle the FDA's residual-hydrogen-peroxide regulation into the construction of this variant of "aseptic." If not indefinite, "aseptically disinfecting" as used in the patent should track the FDA regulation on commercial sterility for equipment and containers used in aseptic processing,

namely, "the condition achieved by application of heat, chemical sterilant(s), or other appropriate treatment that renders the equipment and containers free of viable microorganisms having public health significance, as well as microorganisms of nonhealth significance, capable of reproducing in the food under normal nonrefrigerated conditions of storage and distribution." *See* 21 C.F.R. § 113.3(e)(2).

The intrinsic evidence supports Shibuya's construction because the patents talk about "aseptically disinfecting the bottles." *E.g.*, '188 patent, claims 19, 21, 26, 39. Thus, the patent's recitation of "aseptically disinfecting" refers to sterilizing containers or equipment, as opposed to foodstuffs.

The extrinsic evidence confirms Shibuya's construction. Dictionaries define "aseptic" by reference to pathogens and not to the residual level of sterilant on a container. *See* Ex. C, AMERICAN HERITAGE DICTIONARY 132 (2nd College ed. 1991) (defining "aseptic" as "of or pertaining to asepsis," and "asepsis" as "[t]he state of being free of pathogenic organisms"); Ex. D, RANDOM HOUSE UNABRIDGED DICTIONARY 121 (2nd ed. 1993) (defining "aseptic" as "free from the living germs of disease, fermentation, or putrefaction").

Steuben, however, attempts to import FDA regulation § 178.1005(d) into the claim term. As discussed above, the Federal Circuit has already ruled against Steuben on this point, *Nestle I*, 686 F. App'x at 919; moreover, Claim 22 of the '188 patent recites the same residual-hydrogen-peroxide limitations found in the

regulation. Therefore, Steuben's construction would render the phrase "the plurality of filled bottles does not have a residual level of hydrogen peroxide of about 0.5 ppm or more" in claim 22 superfluous. *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("[C]laims are interpreted with an eye toward giving effect to all terms in the claim."); *Digital-Vending Services Intern., LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1274–75 (Fed. Cir. 2012) (refusing to construe "registration server" to be "free of content managed by architecture" when another claim recited "each registration server being further characterized in that it is free of content managed by the architecture").

### c. Steuben's Reply Brief

Shibuya's resort to a general purpose dictionary fails because the Federal Circuit held "aseptic" is specifically defined according to the "binding lexicography" in the specification. *Nestlé I*, 686 F. App'x at 919. Shibuya's claim differentiation argument also misses the mark because Steuben is not asking the Court to read the FDA's residual hydrogen peroxide requirement into the claims. Thus, Shibuya's argument that other claims already recite that requirement does not apply.

### 3. "aseptically sterilized foodstuffs"

| Steuben's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Not indefinite. | Indefinite; |
| "Aseptic" construed as above, no further construction necessary. | Alternatively, Foodstuffs that, by application of heat, were rendered free |

| | |
|---|---|
| To the extent further construction is required: foodstuffs sterilized in compliance with the United States FDA level of aseptic (i.e. the FDA regulations governing/related to aseptic packaging). | of microorganisms capable of reproducing in the food under normal nonrefrigerated conditions of storage and distribution and viable microorganisms (including spores) of public health significance. OR Foodstuffs sterilized sufficiently to meet the FDA aseptic standard. |

### a.  Steuben's Opening Brief

As explained *supra*, this term needs no construction beyond the construction of aseptic.

### b.  Defendants' Answering Brief

If this term is not indefinite, then "aseptically sterilized foodstuffs" should track the FDA's regulation for commercial sterility of foodstuffs: "foodstuffs that, by application of heat, were rendered free of microorganisms capable of reproducing in the food under normal nonrefrigerated conditions of storage and distribution and viable microorganisms (including spores) of public health significance." *See* 21 C.F.R. § 113.3(e)(1). As noted above, dictionaries define "aseptic" in a similar way. *See supra* § III.A.2.(b).

Steuben argues that no construction beyond the construction of "aseptic" as the "FDA level of aseptic" is necessary, but that position is simply a tactic to avoid having this Court rule that "FDA level of aseptic" does not include the residual-

hydrogen-peroxide regulation of § 178.1005(d), as the Federal Circuit has already determined.

### c. Steuben's Reply Brief

The Court should reject Shibuya's request that the Court modify the Federal Circuit's construction of "aseptic" to identify specific regulations as part of claim construction.

### 4. "aseptically bottling"

| Steuben's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Not indefinite.<br><br>"Aseptic" construed as above, no further construction necessary.<br><br>To the extent further construction is required: bottling in compliance with the United States FDA level of aseptic (i.e. the FDA regulations governing/related to aseptic packaging). | Indefinite;<br><br>Alternatively, filling of a commercially sterilized cooled product into presterilized bottles in an atmosphere free of microorganisms. |

### a. Steuben's Opening Brief

As explained *supra*, this claim term needs no construction beyond the construction of aseptic.

### b. Defendants' Answering Brief

If not indefinite, "aseptically bottling" should track the FDA's definition of "aseptic processing and packaging": "filling of a commercially sterilized cooled product into presterilized bottles in an atmosphere free of microorganisms." *See* 21 C.F.R. § 113.3(a).

Steuben argues that no construction beyond the construction of "aseptic" as the "FDA level of aseptic" is necessary, but, again, this is just a ploy to avoid having this Court rule that "FDA level of aseptic" does not include the residual-hydrogen-peroxide regulation of § 178.1005(d).

### c. Steuben's Reply Brief

The Court should reject Shibuya's request that the Court modify the Federal Circuit's construction of "aseptic" to identify specific regulations as part of claim construction.

### B.   Means-Plus-Function Terms

**1.   "means for providing a plurality of bottles" / "means for providing a plurality of bottles, the means include a bottle infeed"**

| Steuben's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Function: providing a plurality of bottles.<br><br>Corresponding structure: a pushing element, and equivalents. | Means plus function claim.<br>Function: provide bottles into the sterilization apparatus.<br>Corresponding structure:<br><br>A first bottle unscrambler (Fig. 1-2: Item 20);<br><br>a second bottle unscrambler [sic] (Fig. 1: Item 30);<br><br>a bottle lifter (Fig. 1: Item 40);<br>a first lane 18 Fig. 1: Item 18);<br><br>a bottle infeed and sterilization apparatus (Fig. 5: Item 60);<br><br>a gate in the lanes (Fig. 5: Items 76 and 78);<br><br>an infeed apparatus (Figs. 4-5: Item)<br><br>pushing element (Fig. 5: Item 84). |

### a.  Steuben's Opening Brief

#### (1)   Function

The claimed function is as stated in the claim term; namely "providing a plurality of bottles." *See Generation II Orthotics, Inc. v. Med. Tech., Inc.,* 263 F.3d 1356, 1363 (Fed. Cir. 2001) (internal quotation omitted).

**(2)**     **Structure**

The structure disclosed in the '188 patent for carrying out the claimed function is a pushing element, which provides the bottles to the machine, and equivalents thereof. 35 U.S.C. § 112, ¶ 6. An exemplary pushing element is disclosed as element 84 in Fig. 3.

In order to determine the structure from the specification that will serve as a claim limitation, "the court ascertains the corresponding structure in the written description that is *necessary to perform that function*." *Kinzenbaw v. Case LLC*, 179 F. App'x 20, 24 (Fed. Cir. 2006) (original emphasis) (internal quotation omitted). Indeed, "Section 112 paragraph 6 does not permit incorporation of structure from the written description beyond that necessary to perform the claimed function." *Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1369-70 (Fed. Cir. 2001) (internal quotation omitted). "Structural features that do not actually perform the recited function do not constitute corresponding structure and thus do not serve as claim limitations." *Id*. at 1370.

The '188 patent (at 5:33-35) explains that the machine "includes a pushing element **84** for pushing the bottles **12** in the first horizontal row **24** into a first vertical lane **26**" of the machine. This statement clearly associates the pushing element with the structure to perform the claimed function. Dr. Cullen Buie, a professor at MIT and a POSITA, explains that "a skilled artisan would understand that the structure

corresponding to the claimed function 'providing a plurality of bottles' is: a pushing element, and equivalents."  Ex. 8, Dkt. 333-2, ¶ 13.

Defendants ask the Court to import a laundry list of structure that is not necessary for performing the claimed function of "providing a plurality of bottles" (*e.g.* a bottle unscrambler).  The Court should reject Defendants' proposed structure because "a court may not import . . . structural limitations from the written description that are unnecessary to perform the claimed function."  *Wenger Mfg. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001).

### b.  Defendants' Answering Brief

#### (1)    Function

Steuben argues the function is "providing a plurality of bottles." Shibuya believes that it would be more precise and helpful to the jury to say "providing bottles into the sterilization apparatus." The only discussion in the specification of providing bottles is to the sterilization apparatus. '188 patent, 4:58-61, 5:4-40. Steuben's expert Dr. Buie admitted at his deposition that "a skilled artisan would understand that the bottles are being provided to the sterilization section." Ex. E, Buie Tr. 421:10-12. Hence, Shibuya's proposed function is the better one.

#### (2)    Structure

For the corresponding structure, the parties' dispute centers on whether the structure is only "a pushing element" (as Steuben proposes) or also includes (i) bottle

unscramblers 20 and 30, (ii) lane 18, (iii) bottle lifter 40, (iv) infeed and sterilization apparatus 60, (v) gate 76 and row 24, and (vi) infeed apparatus 80 (as Shibuya proposes). Steuben's expert Dr. Buie conceded that these additional structures were associated with the claimed function. *Id.* 420:1-422:19. Although Buie stated that these structures were "associated, but not necessary" to carry out the function in all contexts, *id.* 422:16-19; *see also id.* 420:12-18, 425:2-3, that caveat does not alter the fact that, in the patent disclosure, they carry out the function and so should be included as part of the corresponding structure.

The only description of "providing bottles" in the patent identifies Shibuya's proposed structures: "the aseptic processing apparatus 10 includes a first bottle unscrambler 20, a second bottle unscramble [sic] 30, and a bottle lifter 40 for providing a supply of properly oriented empty bottles" that "are delivered to a filler apparatus 50 after passing through a bottle infeed and sterilization apparatus 60." '188 patent, 4:58-63. The patent details how these structures work with infeed apparatus 80 (part of infeed and sterilization apparatus 60) to perform the claimed function:

> The first bottle unscrambler 20 manipulates the bottles 12 until the opening 16 of each bottle 12 is in a top vertical position…. The [properly oriented] bottles 12 travel in single file in a first lane 18 to a first bottle lifter 40. The first bottle lifter 40 lifts and transports the bottles 12 to a bottle infeed and sterilization apparatus 60…. A gate 76 in the first lane 18 selectively groups six bottles 12 at a time in first horizontal row 24…. An infeed apparatus 80 includes a pushing element 84 for pushing the

bottles 12 in the first horizontal row 24 into a first vertical lane 26…. The six bottles 12 in the first vertical lane 26…are directed downward into the bottle infeed and sterilization apparatus 60.

*Id.* at 5:4-41; *see also* Fig. 2 (below, annotated).



FIG. 2

Figure 5 of the '188 patent is a cross-sectional overhead view of the bottle infeed and sterilization apparatus 60, including first lane 18, gate 76, first horizontal row 24, infeed apparatus 80, pushing element 84, and first vertical row 26:



FIG. 5

*Id.* 5:23-25, Fig. 5 (annotated). Thus, pushing element 84 does not carry out the function of providing bottles to the sterilization apparatus on its own.  As disclosed in this patent, the function involves other structural elements more closely associated with the function. *See, e.g., id.* 4:60-61 ("bottle lifter 40 for providing a supply of properly oriented empty bottles").  *See also id.* 4:59-63, 5:6-14, 5:26-37; Figs. 1-5. Shibuya's proposed structure includes "all structure that actually performs [that] function." *Cardiac Pacemakers*, 296 F.3d at 1119 (citing *Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1371 (Fed. Cir. 2001)).

41

### c. Steuben's Reply Brief

The structure identified by Shibuya either:  (a) prepares the bottles to be provided or (b) includes structure for disinfecting the bottles after they have already been provided.

As to the structure that prepares the bottles to be provided, Shibuya identifies bottle unscramblers 20 and 30, lane 18, bottle lifter 40, gate 76, and row 24.  Each of these structures performs a function that is different than the claimed function of providing the bottles.  Ex. 8, Dkt. 333-2, ¶¶ 17-21.  As Buie explains, the "additional structure identified by Defendants that is upstream of the sterilization apparatus carries out a number of functions—unscrambling the bottles, lifting the bottles, grouping the bottles—that all take place before the bottles are actually provided to the sterilization chamber by the pushing elements."  *Id*., ¶ 22.

As Shibuya's cited authority provides:  "It remains true, of course, that corresponding structure need not include all things necessary to enable the claimed invention to work."  *Cardiac Pacemakers*, 296 F.3d at 1119.  To that end, "it is not necessary for the defined structure to include every antecedent step enabling the performance of its function."  *Positive Techs., Inc. v. Sony Elecs., Inc.*, No. C-11-02226, 2012 WL 2589921, at *20 (N.D. Cal. July 3, 2012).

Shibuya's argument that the structure for "providing a plurality of bottles" should include the entire infeed and *sterilization* apparatus 60, which sterilizes the

exterior of the bottles, is equally without merit.  By the time the exterior of the bottles is sterilized, the bottles have already been provided into the claimed device.

Shibuya also argues that the means for providing a plurality of bottles includes infeed apparatus 80.  While the parties have grouped two claim terms together, there are two separate claim terms at issue.  Claim 19 recites only "means for providing a plurality of bottles" whereas claims 26, 28, and 39 recite "means for providing a plurality of bottles, the means including a bottle infeed."  This suggests that claim 19 is broader than claims 26, 28, and 39 and demonstrates that the claimed "means for providing a plurality of bottles" does not require a bottle infeed.[8]

While not expressly stated, Steuben understands Shibuya to argue that the structure Shibuya identifies includes the exact individual components of the structure, *e.g.*, the specific lanes of the bottle infeed apparatus.  Shibuya's argument is contrary to Federal Circuit precedent, which explains that "[t]he individual components, if any, of an overall structure that corresponds to the claimed function are not claim limitations."  *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1268 (Fed. Cir. 1999).  "Rather, the claim limitation is the overall structure corresponding to the claimed function," which is "why structures with different numbers of parts may still be equivalent under § 112, [¶] 6, thereby meeting the claim limitation."  *Id.*

---

[8] The "bottle infeed," included in the "means for providing a plurality of bottles" as recited in claims 26, 28, and 39 is not governed by 35 U.S.C. § 112, ¶ 6.

Shibuya's reliance on the '188 patent's disclosure of "a bottle lifter 40 for providing a supply of properly oriented empty bottles" fails because the "providing" referenced there is of a supply of properly oriented bottles to the pushing element. The pushing element ultimately provides the bottles into the claimed aseptic bottling device so that the aseptic bottling process can commence.

### d. Defendants' Sur-Reply

Steuben is wrong when it argues that the pushing element alone performs the function of providing bottles into the sterilization apparatus.

Steuben's cited cases are inapposite because here, unlike in those cases, the specification identifies structure as collectively performing the function of providing bottles to the sterilization apparatus: "the aseptic processing apparatus 10 includes a first bottle unscrambler 20, a second bottle unscramble[r] 30, and a bottle lifter 40 *for providing a supply of properly oriented empty bottles.*" '188 patent, 4:58-62 (emphasis added). "A gate 76 in the first lane 18 selectively groups … bottles 12 at a time in first horizontal row 24…. An infeed apparatus 80 includes a pushing element 84 for pushing the bottles 12 in the first horizontal row 24 into a first vertical lane 26." *Id.* 5:29-35. The bottles are then directed to the bottle infeed and sterilization apparatus. *Id.* 5:38-40. Thus, the specification describes the function of providing bottles as comprising all of the steps outlined above, not just the final push.

44

As shown above, infeed apparatus 80 is part of infeed and sterilization apparatus 60, and the specification describes these structures as providing bottles: "The bottle infeed and sterilization apparatus 60 preferably inputs six bottles 12 in a horizontal direction from the first lane 18…" *Id.* 5:26-29; *see also* FIG 5. "An infeed apparatus 80 includes a pushing element 84 for pushing the bottles…." *Id.* 5:33-35.

Although some of the claims recite a bottle infeed, the specification's disclosure of particular structure overcomes the presumption of claim differentiation. *See Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005). Pushing element 84 is included in infeed apparatus 80. The parties agree that at least pushing element 84 is required, and Dr. Buie confirmed that "no other pushing elements [are] described" for the purpose of providing bottles. Ex. E, Buie Tr. 360:5-13. Thus, infeed apparatus must be corresponding structure because it includes the only pushing element in the specification.

### 2. "means for [aseptically] filling the aseptically disinfected plurality of bottles at a rate greater than 100 bottles per minute"

| Steuben's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Function: aseptically filling the aseptically disinfected plurality of bottles at a rate greater than 100 bottles per minute.<br><br>"Aseptic" as construed above.<br><br>Corresponding structure: a control system for controlling the filling valves | Function: filling the aseptically disinfected plurality of bottles at a rate ranging from 100 bottles per minute to infinite bottles per minute.<br><br>Corresponding structure: |

| and filling nozzles, and a conveyor system that conveys the bottles at such a speed that over 100 bottles are filled per minute, and equivalents. | filling valves (Fig.13: Items 194A, 194B) and filling nozzles (Fig. 13: Items 190A, 190B)<br><br>a control system 550 (Figs 1, 3, 13: Item 550)<br><br>and a conveyor plate. (Fig. 8: Item 94) |

### a. Steuben's Opening Brief

#### (1)    Function

The claimed function is as stated in the limitation:  aseptically filling the aseptically disinfected plurality of bottles at a rate greater than 100 bottles per minute."

#### (2)    Structure

The structure disclosed in the '188 patent for carrying out the claimed function is a control system for controlling the filling valves and filling nozzles, and a conveyor system that conveys the bottles at such a speed that over 100 bottles are filled per minute, and equivalents thereof.

Steuben's identified structure is the structure that is necessary to perform the claimed function and is clearly linked to the claimed function.  For example, the '188 patent explains that "[t]he control system **550** calculates the desired volume of product to be inserted into each bottle **12**, and controls the product volume by opening or closing a plurality of valves **194A** and **194B**." '188 patent, 10:61-64.  In view of the specification, Dr. Buie explains that "[t]he control system, therefore is

necessary for controlling the filling valves and nozzles that accomplish the filling aspect of the claimed function," and further that "[t]he control system also controls the speed of the conveyor, which determines the rate at which the system fills the bottles." Ex. 8, Dkt. 333-2, ¶ 48.

As for filling the bottles at a rate greater than 100 bottles per minute, the '188 patent discloses (at 7:62-63) a main conveyor, which "the bottles **12** are conveyed from station to station through the filler apparatus **50**." The conveyor is necessary to process the bottles through the system at a rate greater than 100 bottles per minute. To that end, Dr. Buie explains that a POSITA "would understand that the conveyor transports the bottles to and from the filling nozzles, and is therefore corresponding structure for filling the bottles at a given rate." Ex. 8, Dkt. 333-2, ¶ 48.

Based on the parties' briefing in the WDNY, Steuben understands that Defendants agree with Steuben's proposed structure, but also ask the Court to limit the structure to require a specific configuration of bottles on a conveying plate; namely, a 2 x 6 matrix. *See* Dkt. 318 at 19. That specific configuration is not necessary to perform the claimed function and is therefore not corresponding structure.

### b. Defendants' Answering Brief

#### (1)   Function

The parties' dispute over the claimed function is whether there is any upper limit on "at a rate greater than 100 bottles per minute." *See* Section III.C.1.(b), *infra*.

#### (2)   Structure

Steuben's briefing on this issue in the Western District of New York stated that the corresponding structure "includes filling valves and nozzles, a control system, and a conveyor system." Ex. F, Steuben Reply, at 37. Shibuya agrees that these are the corresponding structures. In its briefing here, Steuben appears to omit the filling valves and filling nozzles as corresponding structure (leaving only the control system and conveyor system), even though no bottles can be filled without those valves and nozzles.

An additional dispute centers on the conveyor. The '188 patent discloses only conveyor apparatus 110, which indexes the bottles (i.e., advances them in stepwise fashion) so they can be disinfected in batches.  *See* '188 patent, Fig. 3.



FIG. 3

An integral component of conveyor apparatus 110 is conveying plate 94.  *See id.* 7:57-60; Fig. 8.

49



FIG. 8

Conveying plate 94 holds a batch of 12 bottles in a 2 x 6 matrix.  The patent states that the bottles are "displaced" (i.e., moved through the system) by plate 94. *Id.* 7:41-43.  Thus the patent clearly associates plate 94 with the claimed function.

The prosecution history supports Shibuya's proposed structure. During reexamination, the Examiner confirmed claim 19 because "the prior art fail[ed] to teach or fairly suggest … the means for filling the bottles at a rate greater than 100 bottles per minute," and described the corresponding structure:

> The structure for filling the bottles at a rate greater than 100 bottles per minute includes: a control system for calculating the desired product volume and controlling the product volume; a single filler apparatus; and a conveyor system which indexes a 2 x 6 matrix of bottles through the various stations at such speed

> that over 100 bottles are filled/minute. The combinations of these
> structures are not disclosed in or obvious in view of the prior art.

Ex. G, Office Action of Control Nos. 90/011,072, 90/011,357 at 97-98 (Apr. 23, 2013). Having gotten claim 19 through the reexamination based on conveyor structure that "indexes a 2 x 6 matrix of bottles through the various stations," Steuben cannot now simply ignore that structure in this case.

The matrix dimensions are not the only point of contention over the conveyor. The conveyor in the patent is a linear system that indexes the bottles in batches of 12. To show infringement, Steuben must prove that Shibuya's system (a rotary system that rotates continuously and processes bottles individually) is structurally equivalent to the system disclosed in the patent. That is, the Court should make it clear that the corresponding structure is the particular conveyor system in the patent, not just any conveyor system. *See J&M Corp. v. Harley-Davidson, Inc.*, 269 F.3d 1360, 1367 (Fed. Cir. 2001).

Finally, although both parties recognize that the patent describes a "control system" as part of the "means" for filling the bottles, for the reasons given *infra* in section III.4.(b), control system is a nonce word that does not identify sufficient structure. Therefore, this term, like the "control system for controlling" is indefinite due to lack of corresponding structure.

### c. Steuben's Reply Brief

Contrary to Shibuya's suggestion, Steuben agrees that filling valves and filling nozzles are corresponding structure. Steuben focused its Opening Brief on the actual dispute here: whether the conveyor that moves the bottles through the machine requires the specific configuration of conveying plate 94.

Shibuya builds its argument not on the perspective of a POSITA, but rather on a statement made by a patent examiner in a reexamination. With all due respect to the patent examiner, he did not conduct any sort of analysis to explain how he arrived at his determination of what constitutes the claimed structure. A proper analysis would find that the 2x6 matrix is simply an embodiment and not necessary to perform the claimed function and therefore not corresponding structure. *E.g.*, Ex. 8, Dkt. 333-2, ¶¶ 51-52.

Buie explains that "the '188 patent also teaches embodiments that do not use a 2x6 matrix, but still fall within the scope of the claimed function of filling the bottles at a rate greater than 100 bottles per minute." *Id.*, ¶ 51. For example, the '188 patent discloses a one lane embodiment—which is not a 2x6 matrix—that facilitates a bottling speed of 180 bottles per minute. *Id.*, ¶ 52. As such, the 2x6 matrix of bottles identified by Shibuya is not necessary to perform the claimed function; instead, the conveyor is and the structure includes a conveyor and equivalents.

Shibuya asserts that "[t]o show infringement, Steuben must prove that Shibuya's system . . . is structurally equivalent to the system disclosed in the patent." The issue before the Court is claim construction, not infringement.  And Shibuya's argument reveals the fundamental flaw in its claim construction arguments.  Shibuya focuses on the overall structure of *an* embodiment disclosed in the '188 patent rather than the structure necessary to perform the claimed function as the law requires.  *See Asyst*, 268 F.3d at 1370.

### d.  Defendants' Sur-Reply

Other than conveying plate 94, which holds 12 bottles in a 2x6 matrix, the '188 patent does not describe any structure to convey bottles: "The filler apparatus 50 is designed to convey the bottles 12 through the various operations of the filler 50 in a two by six matrix. The twelve bottles 12 in the two by six matrix are positioned in, and displaced by, a conveying plate 94 as illustrated in FIG. 8." '188 patent, 7:37-43.

The 2x6 matrix is the only conveying structure disclosed in the patent. Steuben attempts to avoid this fact by pointing to Dr. Buie's declaration, which states, "the '188 patent discloses a one lane embodiment. In this embodiment, only one row of the 2x6 matrix is filled." Ex. 8, ¶ 52. But Buie does not state or imply that the claimed invention uses anything but a 2x6 matrix. Even if the claimed

invention "does not require that a full 2x6 matrix be processed" (*id.* ¶ 54), a partially used 2x6 matrix is still a 2x6 matrix.

### 3.    "means for aseptically disinfecting the plurality of bottles"

| Steuben's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Function: aseptically disinfecting the plurality of bottles.<br><br>"Aseptic" as construed above.<br><br>Corresponding structure: sterilant applicator nozzles for applying sterilant such as hydrogen peroxide or oxonia or any other suitable aseptic sterilant to the exterior and interior of the bottles, sterilant removal stations for removing sterilant from the interior and exterior of the bottles, and equivalents. | Function: aseptically disinfecting the plurality of bottles.<br><br>Corresponding structure:<br><br>1. A structure that acts to sterilize the outer surface of the bottle outside the sterile tunnel (Fig. 4: Item 36), comprising either:<br><br>a. the bottle infeed and sterilization apparatus (Figs. 4-5: Item 60);<br><br>b. sterilant (Fig. 4: Item 14);<br><br>c. sterilant application apparatus (Fig. 3: Item 36);<br><br>d. a plurality of measuring cups connected by an air cylinder (5:6-65);<br><br>OR<br><br>e. direct spray of heated hydrogen peroxide (6:24-26);<br><br>f. a metering pump (6:24-31);<br><br>g. a flow meter (6:24-31);<br><br>h. a spray nozzle (6:24-31, Fig. 4, Item 64); |

|  | 2. A mechanical scissor mechanism and a vacuum "pick and place" apparatus. (7:48-57, Figs. 3 & 4, Item 104);

3. An activation and drying station for the bottle exterior (7:5-9) comprising twelve drying positions in the sterilization chamber (7:7-9);

4. structure that sterilizes the interior of the bottles (8:15-43, Figs. 3 & 10, Item 116) comprising:

a. a sterilant (8:17-20);

b. a plurality of sterilant measuring devices (Figs. 3, 10: Item 120),
c. a plurality of applicator spray nozzles (Fig. 10: Item 122),
d. a reservoir of sterilant (Fig. 3, Item 124)
e. a metering device (5:56-6:10, 6:24-31).

5. An activation and drying station for the bottle interiors (9:8-11, 9:44-46, 10:3-30, Fig. 11: Item 152) comprising:

a. twelve stations for directing hot sterile air, activation and removal of the sterilant from the interior of the bottles (Stations 10 through 21) (9:44-46);

b. sterile air supply system (Fig. 11: Item 146) |
|---|---|

| | |
|---|---|
| | c. hot sterile air supply conduit (Fig. 3: Item 148);<br><br>d. a plurality of nozzles (Figs. 1, 11: Item 150);<br><br>6. A control system (Figs. 1, 3, 13 and 16: Item 550) |

### a. Steuben's Opening Brief

#### (1)    Function

The parties agree that the function is as stated in the limitation:  "aseptically disinfecting the plurality of bottles."  The construction of "aseptically disinfecting" within this claim term should be governed by the construction of "aseptic" discussed *supra*.

#### (2)    Structure

The structure disclosed in the '188 patent for carrying out the claimed function of "aseptically disinfecting the plurality of bottles" is:

(a) sterilant applicator nozzles for applying sterilant such as hydrogen peroxide or oxonia or any other suitable aseptic sterilant to the exterior and interior of the bottles, and

(b) sterilant removal stations for removing the sterilant from the interior and exterior of the bottles, and equivalents thereof.  35 U.S.C. § 112, ¶ 6.

This is the only structure that is linked to and necessary to perform the claimed function of disinfecting the bottles—that is, to apply the sterilant to the bottles and to remove it.  *See Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1352 (Fed. Cir. 2003); *Wenger*, 239 F.3d at 1233.

The '188 patent explains (at 4:48-50) that "[t]he present invention uses an aseptic sterilant such as hydrogen peroxide ($H_2O_2$) or oxonia to sterilize the bottles **12**."   Thus, the sterilant is identified as performing the claimed function of "aseptically disinfecting."  With respect to the exterior sterilization of the bottle, the '188 patent specification explains (at 5:43-46) that "a sterilant **14**, such as heated hydrogen peroxide, oxonia, or other aseptic sterilant, is applied to an outside surface **34** of each bottle **12** by a sterilant application apparatus **36**."  The sterilant application apparatus applies the sterilant to the bottles "through the use of spray nozzles **64**."  *Id.*, 6:21.  The '188 patent likewise discloses (at 8:17-18, 8:23) that the structure necessary to carry out the disinfection of the interior of the bottles includes "[a] sterilant, such as hydrogen peroxide, oxonia or any other suitable aseptic sterilant," that is applied to the interior of the bottles using "applicator spray nozzles **122**."

As for the removal of the sterilant, the '188 patent specification explains (at 6:66-7:1) that the sterilant is removed from the exterior of the bottles by applying "hot sterile air to the outside surface **34** of each bottle **12**."  Thus, a sterile fluid, such as hot sterile air, is applied to the exterior of the bottles to remove the sterilant.

Similarly, the '188 patent explains (at 9:47-48) that, once the sterilant has been applied, it is removed from the interior of the bottles by applying "hot sterile air," through "a plurality of nozzles **150**."   Consistent with § 178.1005(d), the specification explains (at 10:28-30) that following the interior disinfection of the bottles, that "the residual hydrogen peroxide remaining on the bottle **12** surface is less than 0.5 PPM."

Defendants' proposed construction imports a litany of additional structural features from the '188 patent specification that are not necessary to carry out the claimed function.   For example, Defendants' construction includes "a mechanical scissor mechanism and a vacuum 'pick and place' apparatus," structure that is not necessary to perform the function of "aseptically disinfecting."   The Court should reject Defendants' proposed construction.   *Wenger*, 239 F.3d at 1233.

### b. Defendants' Answering Brief

The parties agree that the function is "aseptically disinfecting the plurality of bottles."

The '188 patent describes specific structures to disinfect bottles: (1) a structure that sterilizes the outside of the bottles, '188 patent, 5:38-6:31, Fig. 4; (2) a structure that picks and places the bottles on a conveying plate, *id.* 7:48-57, Figs. 3 & 4; (3) an activation and drying station for the exterior of the bottles, *id.* 7:5-9; (4) a separate structure that sterilizes the interior of the bottles, *id.* 8:15-43, Figs. 3

& 10; (5) a structure for activating and drying the interior of the bottles, *id.* 9:8-11, 9:44-46, 10:3-30; and (6) control system 550, *id.* Figs 1, 15.

With the sole exception of item (2)—a structure that picks and places the bottles on a conveying plate—Steuben's expert Buie conceded that Shibuya correctly identified the structures linked with this function:

*1. Structures that sterilize the bottle exterior*:

- Sterilization apparatus 60 that sterilizes the bottle exteriors is "clearly linked" to the claimed function. Ex. E, 384:14-15 ("So the sterilization apparatus 60 is clearly linked."); '188 patent, 5:15-19.

- Sterilization application apparatus 36 for sterilizing bottle exteriors is "clearly linked" to the claimed function. Ex. E, 384:17-385:4 ("So yes, via the name 'sterilant application apparatus,' it is clearly linked."); '188 patent, 5:57-58.

- A double-tubed heat exchanger for heating hydrogen peroxide to its vapor point is "clearly linked" to the claimed function. Ex. E, 385:6-386:1 ("But the double tube heat exchanger is not necessary, but clearly linked or associated."); '188 patent, 6:4-7.

- The sterilant measuring devices are "clearly linked" with the claimed function. Ex. E, 381:18-382:18 ("Yes. This measuring device is – I'll say it's clearly linked."); '188 patent, 8:23-26.

*2. Structure that activates and dries the bottle exterior*:

- Sterilization chamber 38 with 12 drying positions for activating and drying the bottle exteriors is "clearly linked" to the claimed function. Ex. E, 386:7-12 ("Q: But is it clearly linked or associated? A: It is."); *id*. 388:17-22; '188 patent, 6:32-34.

*3. Structure that sterilizes the bottle interior:*

- The interior bottle sterilization apparatus 116 of Figures 3 and 4 is "clearly linked" to the claimed function. Ex. E, 379:17-381:12 ("so yeah, [interior bottle sterilization apparatus 116] it is through the name, it is clearly linked, but it, in and of itself, is a—it consists of multiple structures."); '188 patent, 8:14-16.

- The control system controls the measuring device for the sterilant and the operation of the nozzles. Ex. E, 364:5-366:22; '188 patent, 5:66-6:1.

*4. Structure that dries bottle interiors*:

- Air supply system 146 for drying the interior of the bottles is "clearly linked" to the claimed function. Ex. E, 386:18-21 ("…so the air supply system is clearly linked or associated…"); '188 patent, 6:37-40.

*5. Control system:*

- Control system 550 is "clearly linked" to the claimed function. Ex. E, 389:10-11 ("Yeah. So I view the control system as not necessary, but clearly linked or associated."); '188 patent, 7:17-19.

The corresponding structure also includes a mechanical scissor mechanism and a vacuum, which pick up bottles after their exteriors have been sterilized and place them into conveying plates so that the interiors may be sterilized: "A mechanical scissors mechanism and a vacuum 'pick and place' apparatus 104 position twelve bottles 12 at a time (in a two by six matrix, Fig. 8) into one of the conveying plates 94." '188 patent, 7:53-57; Figs. 3 & 4. Each conveying plate then carries the bottles to the station where the interior is sterilized. *Id.* 7:63-67, 8:15-31.

The prosecution history supports Shibuya's proposed structure. During reexamination, the Examiner confirmed claim 19 because the following structure was not in the prior art:

> The structure for aseptically disinfecting the plurality of bottles disclosed by Patentee includes: two separate structural devices or elements, one which acts to sterilize the outer surfaces of the bottle followed by activation and drying stations, and a 2nd separate one which after outer bottle sterilization sterilizes the interior of the bottles followed by activation and drying stations; a metering device which meters the amount of sterilant applied to each bottle; and a control system which monitors and controls the spray apparatus…. The combinations of these structures are not disclosed in or obvious in view of the prior art.

61

Ex. G at 97-98. Having obtained its claim based on that particular structure, Steuben cannot now ignore the structure to make it easier to prove infringement.

Steuben asks this Court to construe the structure to cover the generic classes of sterilant, nozzles, and ports. That is improper. *See J&M Corp.*, 269 F.3d at 1367. In *J&M*, the Federal Circuit "sharply limited" the structure covered by a means-plus-function term to the precise structure disclosed patent. *Id*. There, the patent claimed a "gripping means" but only described a gripping structure with two clamps. The Federal Circuit ruled that disclosure did not cover a single-clamp gripping structure but was instead limited to a double-clamp grip. *Id*. at 1368. Steuben should not be allowed to sweep undisclosed structures into the scope of its claims by defining the corresponding structure with generic terms like sterilant, ports, openings, or nozzles.

Finally, Steuben's proposed structure does not include a metering device or a control system. Without those structures, there is no way to determine whether a sufficient amount of sterilant is applied or to regulate the mechanisms used to spray the sterilant.

### c. Steuben's Reply Brief

Shibuya does not argue that the structure it identifies is necessary to perform the claimed function. Instead, its argument hinges on its assertion that Buie testified that the structure identified by Shibuya is "linked" to the claimed function. But the legal test "turns on what is recited in the written description, clearly linked to the

stated function, ***and*** necessary to perform that function." *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1264 (Fed. Cir. 2005) (emphasis added). That a particular piece of structure might be broadly "linked" to a function does not mean it is necessary to perform the claimed function, and "Section 112 paragraph 6 does not permit incorporation of structure from the written description beyond that necessary to perform the claimed function." *Asyst*, 268 F.3d at 1369-70.

Consistent with the correct legal test, Buie explained that he "looked for structure that was clearly linked and necessary that actually performs the function recited." Ex. 14, at 428:20-22. If the structure was clearly linked or associated with the function, but did not actually perform the function, Buie did not identify it as corresponding structure. *Id.*, 429:1-5. Buie followed the correct legal standard, and any testimony he offered to the effect that a particular structure might be linked to the function of "aseptically disinfecting" does not mean that such structure is the proper legal structure under § 112, ¶ 6.

The error in Shibuya's argument is exemplified by its assertion that the structure for ***disinfecting*** the bottles includes a "mechanical scissor mechanism and a vacuum, which pick up bottles." While Shibuya may believe that the scissor mechanism facilitates moving the bottles to the structure that disinfects the bottles is "linked" to disinfection, the pick and place system quite plainly does not actually perform the claimed function of "aseptically disinfecting" the bottles. Because

Shibuya applied the wrong legal test, the Court should reject its identified structure. Shibuya's reliance on a patent examiner's statement of structure is equally misplaced because the structure identified by the examiner is not necessary to perform the claimed function.

### d. Defendants' Sur-Reply

Steuben ignores many structural components necessary to disinfect the bottles. "The application of sterilant is accomplished with the use of a plurality of sterilant measuring devices 120 and applicator spray nozzles 122." '188 patent, 8:20-22. Similarly, many components remove sterilant: "Stations 10 through 21 include twelve stations for directing hot sterile air into each bottle 12 for the activation and removal of the sterilant from the interior of the bottle 12. The sterile air supply system 146 supplies hot sterile air…in the activation and drying apparatus 152." *Id.* 9:44-49. Steuben omits these structures despite their disclosure as performing the claimed function, including measuring devices (8:23-26), sterilization chamber 38 (6:32-34), and sterile air-supply system 146 (6:37-40). *Supra* at 58-61.

The mechanical scissor mechanism is also necessary to sterilize the interiors of the bottles. It picks up and places the bottles on the conveying plate, which then carries the bottles to the station that sterilizes their interiors. '188 patent, 7:53-57, 7:63-67, 8:15-31, Figs. 3 & 4. The prosecution history supports this, noting that the prior art does not disclose "two separate structural devices …, one which acts to

sterilize the outer surfaces of the bottle … and a 2nd separate one which after outer bottle sterilization sterilizes the interior of the bottles." Ex. G at 97-98. The mechanical scissor mechanism is necessary to transport the bottles between these two structures.

### 4.    "control system for controlling aseptic bottling conditions"

| Steuben's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Not indefinite.<br><br>Not means plus function.<br><br>No construction necessary. | Indefinite.<br><br>Alternatively,<br><br>Function: controlling aseptic bottling conditions<br><br>Corresponding Structure includes at least:<br><br>1. A control system (Fig. 16: item 550) attached to:<br><br>    a. a bottle counter (Fig. 16: Item A);<br><br>    b. proximity sensors (Fig. 16: Item 114 B);<br><br>    c. conductivity sensors (5:66-6:1, Fig. 16: Items C1 and C2):<br><br>    d. a pressure sensor (Fig. 16: Item C3);<br><br>    e. a temperature sensor (Fig. 16: Item C4);<br><br>    f. a proximity sensor (Fig. 3: Item 71); |

|  | g. a temperature sensor (Fig. 16: Item E); |
|  | h. a proximity sensor (Fig. 16: Item 114, F); |
|  | i. Conductivity sensors (Fig. 16: Items G1 and G2); |
|  | j. a pressure sensor (Fig. 16: Item G3); |
|  | k. a temperature sensor (Fig. 16: Item G4); |
|  | l. a temperature sensor (Fig. 16: Item H); |
|  | m. a plurality of flow sensors (Fig. 16: Item I) |
|  | n. a pressure sensor (Fig. 16: Item J) |
|  | o. a volumetric measuring device (Fig. 16:  Item K) |
|  | p. a pressure sensor (Fig. 16: Item L); |
|  | q. a level sensor (Fig. 16, Item M); |
|  | r. proximity sensors (Fig. 16, Item N); |
|  | s. a level sensor (Fig. 16: Item O); |
|  | t. a temperature sensor (Fig. 16: Item P); |

|  | u. a temperature sensor (Fig. 16: Item Q);

v. proximity sensors (Fig. 16: Item R);

w. a speed sensor (Fig. 16: Item S);

x. a concentration sensor (Fig. 16: Item T);

y. a pressure sensor to ensure that the pressure of the oxonia is maintained above a predetermined level in the sanitizing apparatus 300 (Fig. 16: Item U); and

z. a temperature sensor (Fig. 16: Item V). |
|---|---|

### a. Steuben's Opening Brief

This term needs no construction, beyond the construction of "aseptic," which is governed by the lexicography in the patents as discussed, *supra*.

Defendants argue that this claim term is indefinite, and Steuben will respond if and when they attempt to make a showing in that regard.  Defendants also argue that this claim term—which does not recite a "means for"—is nonetheless governed by 35 U.S.C. § 112(6).  Where a claim term is not drafted using "means" language, "the Court presumes that the term is not a means-plus-function limitation, and it is Defendants' burden to prove otherwise—*i.e.*, to show that a person of ordinary skill in the art would not understand the term to have a sufficiently definite meaning as

the name for structure." *Collaborative Agreements, LLC v. Adobe Sys. Inc.*, No. 15-CV-03853-EMC, 2015 WL 7753293, at *4 (N.D. Cal. Dec. 2, 2015).  Dr. Buie explains the term "control system for maintaining aseptic bottling conditions" connotes definite structure to a POSITA. Ex. 9, Dkt. 359, ¶ 10.  The term should not be construed under § 112(6).  *Collaborative Agreements*, 2015 WL 7753293, at *4.

### b.  Defendants' Answering Brief

The Court should construe this term as being in means-plus-function format. A term that does not use the words "means for" may nevertheless be a means-plus-function term if it "fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015) (en banc) (citations omitted).

"Control system" does not recite a definite structure. *See Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996); *see also* Ex. H, Swartzel Decl. ¶¶ 12-25 (discussing "feedback control system" in the '013 patent). The word "system" is a nonce word. *Verint Sys. Inc. v. Red Box Recorders Ltd.*, 166 F. Supp. 3d 364, 381 (S.D.N.Y. 2016) ("system" alone does not describe structure). "Control" provides only a functional description and does not connote any particular structure. *See id.* ("communication monitoring system" lacked structure because "communication monitoring" described the system's function, not its structure).

Thus, this term recites function without sufficient structure for performing that function. *Williamson*, 792 F.3d at 1349.

The only "control system" disclosed in the '188 patent is control system 550, which "gathers information and controls process functions." '188 patent, 14:2-4; *see also* Fig. 3; Ex. H, ¶¶ 16-19. For example, "control system 550 may respond in different ways to the outputs of the control and monitoring devices" such as adjusting operational parameters, generating or logging error messages, or shutting down the aseptic processing apparatus. '188 patent, 14:11-17; *see also id.* 4:65-66; 5:66-6:3; 6:16-18; 7:14-17; 10:61-64. But the specification fails to state *what* performs these functions and in what way. Figure 3 depicts control system 550 as, literally, a black box floating near the system:



A POSA might well have thought that these functions require implementation by computer software. Ex. H, ¶ 20. But the specification fails even to disclose a computer, let alone an algorithm for carrying out this function. *Media Rights*, 800 F.3d at 1374; *see also Advanced Ground Info. Sys., Inc. v. Life360, Inc.*, 830 F.3d 1341, 1349 (Fed. Cir. 2016). Because the specification fails to disclose *any* structure that controls aseptic bottling conditions, the term is indefinite.

If the Court determines this term is not in means-plus-function format, it is still indefinite because the phrase "control system for controlling aseptic bottling conditions" does not have a plain and ordinary meaning. The intrinsic evidence fails to shed light on what the patentee meant by this term. The public cannot tell by

reading the patent what the "control system" is, how it operates for "controlling aseptic bottling conditions," or what is used to do the controlling.

The specification states that control system 550 adjusts operational parameters in response "to the outputs of the control and monitoring devices." '188 patent, 14:13-19. "In the preferred embodiment of the present invention, the control and monitoring devices include" the items below. *Id.* at 14:19-21. Therefore, if the Court finds that the terms is in means-plus-function format and has a corresponding structure, then the correct structure includes bottle counter A; proximity sensors 71, 114, B, F, N, R; conductivity sensors C1, C2 G1, G2; pressure sensors C3, G3, J, L; temperature sensors C4, E, G4, H, P, Q, V; a plurality of flow sensors I; a volumetric measuring device K; level sensors M, O; a speed sensor S; a concentration sensor T; and a pressure sensor U. '188 patent, 14:13-15:36; *see also* Figs. 3 & 16. Steuben's expert Buie confirmed that control system 550 is the only control system in the '188 patent and that components A through V above are part of that control system. Ex. E, 359:9-16; *id.* 347:13-18.

### c. Steuben's Reply Brief

Because this claim term does not recite "means for," there is a presumption that it is not governed by 35 U.S.C. §112, ¶ 6, and Shibuya has failed to rebut that presumption. Shibuya's argument that "control system" is not a definite structure fails to account for the full claim language. The claim does not recite a generic

control system; rather, it recites a specific type of control system used to maintain aseptic bottling conditions.  The full language provides definiteness to the structure because POSITAs understand that a control system that maintains aseptic bottling conditions is a specific type of control system.  Ex. 9, Dkt. 359, ¶ 11.

Buie explains that the patent specification "describes the simple and well-known process for how the control system maintains aseptic bottling conditions." *Id.*, ¶ 14.  Indeed, the FDA's "Guide to Inspections of Aseptic Processing and Packaging for the Food Industry," includes a paragraph discussing the types of control systems used in aseptic packaging.  Ex. 15, Dkt. 333-8, at 6; *see also* Ex. 9, Dkt. 359, ¶ 15; Ex. 16, Dkt. 333-6.  Consistent with that, Shibuya's instruction manual for one of the accused devices discusses a "feedback control system."  Ex. 17, Dkt. 334-1, at SK-0001892.  These industry references to a "control system" demonstrate that the term is not a means plus function term.  *See Intellectual Ventures II LLC v. BITCO Gen. Ins. Corp.*, No. 6:15-CV-59, 2016 WL 125594, at *19 (E.D. Tex. Jan. 11, 2016).  Shibuya's reliance on Swartzel is misplaced because Swartzel's deposition revealed that he is not qualified to opine on control systems. Ex. 6 at 72:1-18.

Shibuya argues that because the claimed control system could be implemented by software, the specification must disclose an algorithm.  But Buie explains that such software is "commonplace," and "a skilled artisan would make use of known

processes to implement the feedback control system," described in the patent.  Ex. 9, Dkt. 359, ¶ 14.  Moreover, Shibuya applies an overly restrictive definition of "algorithm" which is inconsistent with the law.  *See SPX Corp. v. Bartec USA, LLC*, 557 F. Supp. 2d 810, 819-20 (E.D. Mich. 2008).

Shibuya's indefiniteness argument fails because a POSITA would understand the term without the need for construction as confirmed by the specification's description of the control system (*e.g.*, 5:66-6:58; 14:1-21), the testimony of Buie and the FDA inspection document discussed *supra*.  *See Genband USA LLC v. Metaswitch Networks Ltd.*, 2015 WL 1518007, at *20-21 (E.D. Tex. Apr. 2, 2015).

Shibuya's argument that if the claim term is construed to be governed by Section 112, ¶ 6 it must include dozens of specific sensors and monitoring devices is without merit because "[t]he individual components, if any, of an overall structure that corresponds to the claimed function are not claim limitations."  *Odetics, Inc.*, 185 F.3d at 1268.

### d.  Defendants' Sur-Reply

In its reply, Steuben for the first time cites FDA guidance that purportedly shows that a control system connotes structure. But that guidance, which states "there are controls that, if operating properly, will automatically preclude the packaging of non-sterile product into sterile containers," describes the control system in purely functional terms. Ex. 15 at 6; *see also* Ex. 9 ¶ 14; Ex. H, Swartzel

Dec. ¶ 12-25. But the patent system permits functional claiming only as circumscribed by § 112, ¶ 6, which requires a corresponding structure. Steuben cites *Odetics, Inc. v. Storage Tech. Corp.* to argue that corresponding structure need not identify individual components. Reply at 11-12, 16-17 (citing 185 F.3d 1259, 1268 (Fed. Cir. 1999)). But the quoted language refers to finding structural equivalency under § 112, ¶ 6 *after* corresponding structure had been determined. *Odetics*, 185 F.3d at 1267-68. *Odetics* thus supports Shibuya, not Steuben: "the relevant structure is that which 'corresponds' to the claimed function." *Id.* at 1268.

### C.   Other Terms

#### 1.   "at a rate greater than 100 bottles per minute" / "rate of more than 350 bottles per minute"

| Steuben's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| No construction necessary. | At a rate ranging from 100 bottles per minute to infinite bottles per minute/at a rate ranging from 351 bottles per minute to infinite bottles per minute. |

#### a.  Steuben's Opening Brief

These easily understood claim terms need no construction.  As set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005), "the ordinary meaning of claim language as understood by a [POSITA] . . . may be readily apparent even to lay judges, and claim construction in such cases involves little more than the

application of the widely accepted meaning of commonly understood words." Such is the case here, and this claim term does not need to be construed by the Court.[9]

Defendants' construction asks the Court to construe these claim terms to require an "infinite" number of bottles per minute in order to set up an enablement argument that it is impossible to enable an infinite throughput. No skilled artisan would read the phrases "greater than 100 bottles per minute"/"greater than 350 bottles per minute" and determine that the inventor was intending to claim an impossible throughput. Indeed, infinity is a mathematical construct and not a number. The Court should reject Defendants' argument because "[i]n approaching claim construction, we must always be conscious that our objective is to interpret the claims from the perspective of one of ordinary skill in the art, not from the viewpoint of counsel or expert witnesses retained to offer creative arguments in infringement litigation." *Dayco Prods., Inc. v. Total Containment, Inc.*, 258 F.3d 1317, 1324 (Fed. Cir. 2001) (citation omitted).

---

[9] Steuben brings to the Court's attention the fact that Magistrate Judge McCarthy in the WDNY recommended a construction of this term as follows: "to mean 'at a rate ranging from greater than 100 bottles per minute to an infinite (that is, indefinite) number of bottles per minute'." *Steuben Foods, Inc. v. Oystar Group*, No. 10-cv-780, Dkt. 373 at 11 (W.D.N.Y. Mar. 16, 2020). Steuben has objected to that Report and Recommendation and does not understand Defendants to request that the Court adopt this construction, which—even if adopted by District Court Judge Wolford is not binding on this Court. *See Sprint Commc'ns Co., L.P. v. Charter Commc'ns, Inc.*, No. 1:17-CV-01734-RGA, 2019 WL 1082067, at *3 (D. Del. Mar. 7, 2019) ("I am not, however, bound by a claim construction adopted in another district court.").

These terms need no construction, and the Court should reject Defendants' construction.

### b. Defendants' Answering Brief

On their face, these terms have no upper limit. Steuben suggests that they have some upper limit but is unable to say what that limit is. Neither the specification nor the claims provide an upper boundary for these terms. Steuben's expert's testimony during reexamination and the inventor's deposition testimony confirm that there is no upper limit.

During the reexamination of the '188 patent, Steuben's expert Dr. Sastry was asked: "The claims that say, for example, at least greater than 100 bottles per minute…. Those claims don't have an upper bound, upper boundary, do they?" Ex. I, Sastry Dep., IPR2014-00054, 570:2-7. He responded, "Yeah, they don't have an upper bound specifically." *Id.* 570:10-11. Sastry reconfirmed his interpretation during the reexamination of the '013 patent: "Q: Does the claim term, quote, 'greater than 100 bottles per minute,' close quote, have an upper boundary on the bottle-per-minute speed? … A: Nothing that I have -- I could see there." Ex. J, Sastry Dep., IPR2014-00041, 203:22-204:6.

Inventor Taggart agrees there is no upper limit on the processing rate in claims:

Q. Can I have you turn back to your '013 patent[10] [and] look at Claim 18…. Does the claim have an upper boundary on speed?

A. That portion in that sentence does not have an upper boundary, no.

…

Q. And is your answer the same for the "greater than 100 bottles per minute" limitation in claim 19?

A. Yes. As I read that claim, I do not read an upper limit to that portion of the sentence or the claim.

Ex. K, Taggart Tr. 493:8-494:25. When asked about claim 19 of the '188 patent, Taggart similarly testified, "I don't see a limit on the speed." *Id.* 505:5-506:6.

Magistrate Judge McCarthy in the Western District of New York has construed the "100 bottles per minute" term to mean "at a rate ranging from greater than 100 bottles per minute to an infinite (that is, indefinite) number of bottles per minute." *Steuben Foods, Inc. v. Oystar Grp.*, 1:10-cv-00780-EAW-JJM, D.I. 373 at 11 (W.D.N.Y. Mar. 16, 2020).

### c. Steuben's Reply Brief

The fact that these claim terms do not recite an express upper limit does not mean that their scope cannot be determined with reasonable certainty.   If the

---

[10] The '013 patent shares priority with the '188 and '591 patents. Claim terms appearing in related patents should generally be construed the same way. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003).

disinfecting or filling process operates at rates greater than 100/350 bottles per minute, it is within the scope of the patent.  As the Federal Circuit has explained, "[a] patent claim to a fishing pole would not be invalid on indefiniteness grounds if it contained a limitation requiring the pole be 'at least three feet long,' even though a 50 foot long fishing pole would not be very practical." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 715 F.3d 891, 902 (Fed. Cir. 2013) (abrogated in part on other grounds) (internal quotation omitted); *see also In re Certain Rotating 3-D Lidar Devices*, Inv. No. 337-TA-1173, 2020 WL 3833104, at *11, App'x A (USITC Apr. 30, 2020) ("at least 200 rpm" not indefinite for lack of an upper limit).  While the lack of an express upper limit may make the claims broad, "breadth is not indefiniteness." *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1367 (Fed. Cir. 2017) (internal quotation omitted).

### d.  Defendants' Sur-Reply

Shibuya contends these terms do not implicitly or expressly state an upper limit. In other words, the claims recite a minimum rate of bottles per minute, up to infinite bottles per minute. Steuben apparently agrees: "If the disinfecting or filling process operates at rates greater than 100/350 bottles per minute[11], it is within the scope of the patent." *Supra* at 77-78.

---

[11] Although grouped under the heading "other indefinite terms," Shibuya has not raised indefiniteness. Rather, the only issue here is whether there is an upper limit.

Steuben's expert Dr. Sharon testified, "I cannot give you an upper number…. I don't see any limits given here in the patents. I couldn't give you an upper limit." Ex. T, Sharon Tr. 364:10-16. Even the named inventor could not provide a limit. Ex. K, Taggart Tr. 505:5-506:6. Because neither party's expert could provide an upper limit, and the patent itself provides none, Shibuya's construction should be adopted.

### 2.    "in a single production line"

| Steuben's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary. | Linear production line and not a rotary machine. |

### a. Steuben's Opening Brief

This easily understood term needs no construction.  Defendants ask the Court to limit the "production line" to a "linear production line and not a rotary machine." Dkt. 515 at 43.  There is no basis to do so in the intrinsic record.  Instead, Defendants' construction is driven by the fact that they operate rotary machines.  But Federal Circuit precedent "forbids biasing the claim construction process to exclude or include specific features of the accused product or process." *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1331 (Fed. Cir. 2006).

Defendants' argument also runs afoul of the doctrine of claim differentiation because claim 24, recites "an inline bottle filling apparatus."  When the patentee intended to limit the claims to an "inline" or "linear" production line, it did so with

express language. *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1325–26 (Fed. Cir. 2003).

### b.  Defendants' Answering Brief

Contrary to Steuben's assertions, the term "in a single production line" excludes a rotary production line because the intrinsic evidence distinguishes the alleged invention of the '591 patent from a rotary filler. The claims require a speed of at least 350 bottles per minute "in a single production line." Ex. N, re-examination certificate of '591 patent, 1:26-29. But the intrinsic evidence taught away from using rotary fillers because of problems supposedly associated with them.

*First*, the specification explains that rotary fillers were incompatible with the alleged invention due to their low output—"about 7 to 15 seconds for filling"—and cost; meeting the FDA level of aseptic with a rotary filler was "time consuming and expensive." '591 patent, 1:39; 1:47-50.

*Second*, Steuben distinguished rotary fillers from the alleged invention to overcome a rejection during prosecution. Steuben argued: "a rotary machine *teaches away* from the *claimed invention*" because "a rotary machine creates turbulence which is detrimental to the claimed filling operation in view of the variations in speed of the bottles during the filling operation." Ex. O, Remarks, prosecution history of '591 patent at 7 (emphasis added); *see Wi-LAN USA, Inc. v. Apple Inc.*, 830 F.3d 1374, 1390 (Fed. Cir. 2016) ("A patentee cannot make representations

about claim language during prosecution to avoid prior art and then escape these representations when trying to show infringement."). Steuben cannot now reclaim scope it previously forfeited.

Steuben's claim-differentiation argument also lacks merit. Claim differentiation "cannot alter a definition that is otherwise clear from the claim language, description, and prosecution history." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1326 (Fed. Cir. 2003)(internal citation omitted). Since Steuben has disclaimed rotary fillers in the written description of the patent and during prosecution, Steuben cannot use claim differentiation to expand its claim scope to include the rotary fillers.

### c.  Steuben's Reply Brief

Shibuya argues that this term should be construed to exclude "a rotary production line" based on its assertion that the specification purportedly explains that "rotary fillers were incompatible with the alleged invention."  But the cited statement says nothing about the ultimate throughput of the machine, which is largely a function of the number of filling stations and certainly does not operate to disclaim a rotary filler.

Shibuya's argument that Steuben allegedly distinguished rotary fillers during prosecution fails to acknowledge that Steuben made the statement in discussing claims 24 and 25, ***which are expressly limited to an "inline bottle filler*.***"  Asserted

claim 26, which is being construed, does not include such a limitation, and covers linear and rotary systems.

### d. Defendants' Sur-Reply

Steuben wrongly argues that the '591 patent does not disclaim rotary fillers. Steuben's argument—that throughput is a function of the number of filling stations—contradicts the specification, which discourages rotary fillers with multiple filling stations for having the "time consuming and expensive process" of removing, sterilizing, and replacing the filler's interior parts. '591 patent, 1:39-50. The '591 patent addresses this problem by having a single filler apparatus connected to two filling stations, "which is easy to clean and sterilize." *Id.* 2:32-40, 4:65-5:1; 13:35-36 (showing two filling stations), FIGs. 1-3, 13 (showing filling stations 23 and 25), 16, 22. Indeed, the '591 patent only describes linear production lines. Thus, Steuben understood "a single production line" to mean a linear line.

The prosecution history further supports this notion. Although claim 24 recites an "inline" apparatus and others do not, Steuben made clear that all of the claims require non-rotary fillers because the inventions attained high rates of filling because they were all configured as the linear examples in the specification.  *See* Ex. S, 11 (Steuben describing that the high fill rate of the invention "is achieved via a single production line *as shown in Figures 1-4, 13, and 16* of the ['591] Patent").

### 3. "first sterile region surrounding a region where the product exits the valve"

| Steuben's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary. | A sterile area through which product flows. |

### a. Steuben's Opening Brief

This easily understood claim term needs no construction. POSITAs understand without construction that a "sterile region" is a region that is sterile. Defendants argue that the claim term requires food to flow through the sterile region. While the claim would cover such a reading, it is not limited to it.

### b. Defendants' Answering Brief

The parties dispute whether this term requires food product to flow through the first sterile region. Steuben Opening Br. *Supra* at 83. The claim states that "the product exits the valve." '591 patent, claim 26. The specification states that "[a] first sterile region 260 surrounds the nozzle 196A through which the product 262A exits." *Id.* 14:2-3. This first sterile region is where the food product flows from the nozzle into the sterilized bottles. This happens when "the actuator 258A has displaced the valve stem 256A in a downward direction. The valve 194A is removed from the nozzle 196A allowing product 262A to flow into a bottle 12 (not shown)." *Id.* 14:44-47; Fig. 26 (annotated). Accordingly, a POSA would understand this term to mean "a sterile area through which the product flows."



'591 patent, Fig. 26 (annotated).

### c.  Steuben's Reply Brief

The claim language demonstrates the error in Shibuya's argument.  The "first sterile region" surrounds where the product exits the valve.  Shibuya's argument would limit the first sterile region to the valve exit itself, but the sterile region is broader than that and surrounds the area where the product exits the valve as the claim language expressly recites.

### d.  Defendants' Sur-Reply

Steuben mischaracterizes Shibuya's proposed construction as limiting the sterile region to the valve exit. Shibuya's construction is "a sterile area through which product flows," which includes the valve exit and the surrounding region where the bottles are filled.

### 4.   "a second sterile region positioned proximate said first sterile region"

| Steuben's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary. | A sterile area through which food does not flow. |

### a.  Steuben's Opening Brief

Like the term "first sterile region," this term needs no construction. Defendants argue that the second sterile region must be one where food does not flow.  But there is no such limitation in the claim language, and the intrinsic record includes no disclaimer of claim scope.   The Court should reject Defendants' construction.

### b.  Defendants' Answering Brief

The second sterile region is "a sterile area through which the food does not flow." The second sterile region creates a sterile area between the non-sterile and first sterile regions so that the valve stem moving in and out of the first sterile region is free of contaminants when extended into the first sterile region. '591 patent, Abstract, 14:18-23.

As discussed above, the valve stem carries contaminants from the non-sterile region to the second sterile region. The portion of the valve stem is then "sterilized in the second sterile region 270A" removing any contaminants. *Id.* 14:53-57. A POSA would understand the second sterile region to be free of food products

because the second region is continuously sterilized to counteract the contaminants that are regularly entering the region—and both the continuous sterilization and the introduction of contaminants are inconsistent with food flow.  *See Vivid Techs. Inc. v. Am. Sci. & Eng'g Co.*, 200 F.3d 795, 805 (Fed. Cir. 1999) (stating a patent cannot be construed in a manner that defeats the purpose of the invention).

### c.  Steuben's Reply Brief

Shibuya argues that its construction is the correct one based on its argument that "the second [sterile] region is continuously sterilized to counteract the contaminants that are regularly entering the region."  But the claim recites only "a second sterile region."  Other claims require a "continuously sterilized second sterile region."  Shibuya's argument focuses on the wrong claim language, and the Court should reject it.  Properly understood, the second sterile region is just that—a second region that is sterile.  Because it is sterile, food can flow there in connection with the claimed aseptic filling apparatus.

### d.  Defendants' Sur-Reply

The intrinsic evidence belies Steuben's argument that food can flow in the second sterile region. The second sterile region is a sterile area introduced to eliminate contaminants carried by the valve stem. *Id.* Abstract, 14:18-23, 14:53-57. This second region is kept sterile by continuously introducing sterilizing media while the machine is in operation. *Id.* 14:29-34. If food could flow in the second

region, food would mix with the contaminants and also mix with sterilant in a way that the '591 patent claims to avoid. *See, e.g., id.* 4:55-59, 12:65-67, 16:20-22. Thus, food cannot flow in the second sterile region.

> ### 5. "a valve activation mechanism for controlling the opening or closing of the valve by extending a portion of the valve from the second sterile region into the first sterile region, such that the valve does not contact the bottle, and by retracting the portion of the valve from the first sterile region back into the second sterile region"

| Steuben's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary. | These limitations require a portion of the valve to move back and forth between two regions in a manner that is capable of moving contaminants between the two regions. |

### a. Steuben's Opening Brief

This term needs no construction.[12]   The words of this term are all easily understood without construction.  Defendants ask the Court to limit the term to a preferred embodiment, but the Federal Circuit has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be

---

[12] The WDNY has construed the word "into," which is included in this term to mean "connotes at least the possibility of contact with the contents of the region into which movement occurs."  *Steuben Foods, Inc. v. GEA Process Eng'g*, No. 12-cv-904, Dkt. 432 at 4-9 (W.D.N.Y. Mar. 17, 2017).  Steuben disagrees with the construction and intends to appeal it in due course.  Steuben does not understand Defendants to request that the Court adopt the construction of into, which is not binding on the Court in any event.  *See Sprint Commc'ns*, 2019 WL 1082067, at *3.

construed as being limited to that embodiment." *Continental Circuits LLC v. Intel Corp.*, 915 F.3d 788, 797 (Fed. Cir. 2019). The Court should reject Defendants' narrowing construction.

### b. Defendants' Answering Brief

The '591 patent set out to solve one problem: when the valve opens to allow foodstuffs to be filled into bottles, part of the valve stem can move from the nonsterile region to the sterile region where the foodstuff is located creating a risk that contaminants will move from the non-sterile region into the sterile region and contaminate the food.

According to the patent, "the first portion 264A of the valve stem 256A may carry contaminants from the non-sterile region 268 into the first sterile region 260." '591 patent, 14:18-21; Figs. 23-24.



'519 Patent, Figs. 23-24 (annotated).

To address the problem, a continuously sterilized second sterile region 270 is placed between the non-sterile region and the first sterile region. *See id.* 14:21-26; Fig. 25. Thus, claim 26 of the '591 patent recites "a valve activation mechanism" that "extend[s] a portion of the valve from the second sterile region into the first sterile region" and "from the first sterile region back into the second sterile region."

Figures 25-26 show that contaminants on the valve stem can move from the non-sterile region 268 to the second sterile region 270. As depicted in Figure 25, a portion of the valve stem 266A "lies in the non-sterile region." *Id.* 14:36. When the valve stem moves downward, a portion of valve stem 266A moves from the non-sterile region to the continuously sterilized second sterile region 270A, which "removes any contaminant from the valve stem 256A before any portion of the valve stem 256A enters the first sterile region 260." *Id.* 14:58-61.



'519 Patent, Figs. 25-26 (annotated).

Essentially, the second sterile region serves to "pre-sterilize" the valve stem before entering the first sterile region. *Id.* 14:49-53; *Steuben Foods, Inc. v. GEA Process Eng'g, Inc. S.p.A.*, No. 12-cv-00904, 2016 WL 11258225, at *3 (W.D.N.Y. Aug. 26, 2016) ("It is impossible to 'carry contaminants' from one region to another, or to become "pre-sterilized" in a region unless there is contact with the contents of the regions involved."). There would be no need to do so if a portion of the valve stem could not carry contaminants from one region (non-sterile region) to another (second sterile region).

The main disagreement between the parties is how this claim limitation reads on adjacent regions that have a flexible barrier between them. Suppose that a portion of the valve in the one region moves in a way that stretches a flexible barrier between the regions, thus making the one region larger and the other smaller. Shibuya's point is that that type of movement does *not* constitute "extending a portion of the valve from the continuously sterilized second sterile region into the first sterile region" because the regions continue to be separated from one another by a barrier that prevents material from one region from entering the other.  This is consistent with the decision of the Western District of New York on this issue:

> [T]he '591 patent's specification makes it clear that when a portion of the valve moves from one region into another, it interacts with the contents of each region, such that contaminants may be passed back and forth. In this context, the word "into" cannot fairly be construed to include situations where the relevant portion of the valve is separated from the second region by a physical barrier.

*Steuben Foods, Inc. v. GEA Process Eng'g, Inc.*, 243 F.Supp.3d 377, 381 (W.D.N.Y. 2017). That court also recognized that the regions are defined by physical boundaries rather than being arbitrarily drawn spaces: "While the patent claims are of course not limited to the specific embodiments disclosed in the specification, [Steuben] has offered no explanation for how a 'sterile region' consisting of a fixed area undefined by any physical boundary could be separated from a non-sterile area and filled by sterilizing media." *Id.* at 383. Steuben's request that the Court not construe this phrase is an attempt to preserve its strained argument that a portion of a valve can "extend into" a region without contacting any of the contents of that region.

### c.  Steuben's Reply Brief

Rather than identifying a disclaimer or lexicography to support its rewriting of the claim, Shibuya points to what it understands to be the "purpose" of the invention.  But "[t]he court's task is not to limit claim language to exclude particular devices because they do not serve a perceived 'purpose' of the invention.  Rather, the district court's function is to interpret claims according to their plain language unless the patentee has chosen to be his own lexicographer in the specification or has clearly disclaimed coverage during prosecution."  *E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1370 (Fed. Cir. 2003); *see also Thorner*, 669 F.3d at 1366.

While Shibuya argues that the purpose of the invention is to allow a portion of the valve to be sterilized in the second sterile region so that contaminants do not

move between the two regions, the claim language actually recites only a first and second sterile region.  Different claims recite a "continuously sterilized second sterile region."  Shibuya's argument fails because it is based on claim language not recited in claim 26.

### d.  Defendants' Sur-Reply

"Claims must be construed so as to be consistent with the specification." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (citations omitted). Shibuya's construction requiring the valve to move between the first and second sterile regions in a manner capable of moving contaminants is consistent with the specification.

Steuben is wrong to discount the purpose of the claim limitation. Unlike in *E-Pass Technologies, Inc. v. 3Com Corp.*, 343 F.3d 1364 (2003), which Steuben cites, in the present case, there is but one purpose for the second sterile region, and the purpose is relevant to claim construction. *See Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1369 (Fed. Cir. 2008) ("the purpose of the *limitation* in the claimed invention … is relevant"). As the W.D.N.Y. court recognized, the purpose of the "reciprocating movement of the [] valve stem portion 264A" is "not [to] introduce[] contaminants into the [] first sterile region." *GEA Process Eng'g*, 2015 WL 13273094, at *3.

92

Steuben's argument distinguishing a second sterile region from a "continuously sterilized" sterile region is also without merit. The second sterile region serves to "pre-sterilize" the valve stem before it enters the first sterile region. '591 patent, 14:49-53. No other "second sterile region" is disclosed in the patent.

### 6.   "at least about a 6 log reduction in spore organisms"

| Steuben's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Not indefinite.<br><br>"[A]t least about a 6 log reduction in spore organisms" is properly construed in its full context, "wherein the means for aseptically disinfecting the plurality of bottles, disinfects to a level producing at least about a 6 log reduction in spore organisms.<br><br>"Aseptic" construed as above, no further construction necessary.<br><br>To the extent further construction is required: spore organisms refers to spore test organisms. | Indefinite.<br><br>Alternatively, more than 5.5 log reduction of surrogate spore organism with greatest resistance to the sterilant used. |

### a.  Steuben's Opening Brief

The specification explains that "testing of the aseptic processing apparatus is accomplished with spore test organisms," and that these "test organisms are selected on their resistance to the media [] used to achieve sterility."  '188 patent, 4:31-35.

Steuben's construction of "spore organisms" as "spore test organism" is consistent with the specification, and the Court should adopt it.  *Phillips*, 415 F.3d at 1315.

Defendants argue that this claim term is indefinite.  Dr. Sastry explains that "[t]he term 'about a 6 log reduction' was commonly used in the industry and accounts for the inherent assumptions that are, and probabilities that are accepted, in calculating the population of a colony of microorganisms on a log scale."  Ex. 3, Dkt. 360, ¶ 58.  Defendants offer no expert testimony and will be unable to carry their burden of clear and convincing evidence.

### b.  Defendants' Answering Brief

This term is indefinite because "about" in the context of a logarithmic scale might mean several different things, and the patent provides no guidance on the lower bound for a reduction of at least about a 6 log. *Media Rights*, 800 F.3d at 1371. Inventor Taggart testified that he would interpret "about a 6 log reduction" as "about 5.5 or greater." Ex. K, 450:16-20. Steuben's expert Sastry testified that the threshold was somewhere between a 5.5- and a 6-log reduction but conceded that he could not estimate a lower limit.  Ex. A 422:1-6.  As a result, the "about a 6 log reduction" fails in the public-notice function required by Section 112: one wishing to avoid infringement by doing less than an about a 6-log reduction would not know with reasonable certainty how big a reduction to do.

If the term is not indefinite, a POSA would have understood it to mean "a reduction of more than 5.5 log reduction of surrogate spore organism[13] with the greatest resistance to the sterilant used." Taggart's and Sastry's testimony, cited above, and the prosecution history support this construction. The Examiner recognized that the degree of sterilization achieved depends on the sterilant and the spore organism used for the test. *See* Ex. G at 80. For example, if a more resistant organism were used, it could equate to a larger reduction in a less resistant organism. Thus, the type of surrogate spore organism and sterilant used are critical to the log-reduction calculation.

### c. Steuben's Reply Brief

Shibuya's indefiniteness argument ignores the understanding of POSITAs as to how log reductions are calculated and demands more certainty than is reasonable in the art of aseptic packaging. *See Sonix*, 844 F.3d at 1377. A "6 log reduction" is a million-fold reduction in organisms. In practice, rather than counting the 1 million organisms that are needed to actually demonstrate a 6 log reduction, assumptions are made in counting the original population of microorganisms. Ex. 3, Dkt. 360, ¶¶ 58-61. The use of the qualifier "about" accounts for the fact that the assumptions are not perfect. In related proceedings in WDNY, experts offered by certain defendants

---

[13] Steuben agrees that the term "spore organisms" should be construed to refer to spore test (i.e., surrogate) organisms. Steuben Br. 20 (quoting '188 patent, 4:31-35).

confirmed this fact and testified that a POSITA would "absolutely" understand this. Ex. 18, Dkt. 334-2, at 118:21-25, 119:15-120:6; Ex. 19, Dkt. 333-11, at 158:19-159:15.

The Court should also reject Shibuya's alternative construction that would have the Court construe "at least about a 6 log reduction in spore organisms" to be met by a 5.5 log reduction. On the log scale, a half log is a half order of magnitude away from a 6 log. Sastry Decl., ¶ 62.

### d.  Defendants' Sur-Reply

The specification fails to provide guidance on a lower bound for a reduction of at least about 6 log. Dr. Sastry could not even provide an *estimate*. Ex. A, 422:1-6. As a result, this term is indefinite.

Sastry's testimony also supports Shibuya's alternative construction that the term means "more than 5.5 log reduction" (Response at 27), and Steuben provides no argument to the contrary.

### 7.  "first supply source of sterile air," "second supply source . . . of . . . sterile air," and "third supply source of . . . sterile . . . air"

| Steuben's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary. | (For first supply source of sterile air) Independent place of origin for sterile air.

(For second supply source of sterile air) Second independent place of origin for |

| | sterile air different from the first supply source of sterile air.<br><br>(For third supply source of sterile air) Third independent place of origin of sterile air, different from the first and second supply sources for sterile air. |
| --- | --- |

### a. Steuben's Opening Brief

These terms identify three separate supplies of sterile air (*e.g.* supply pipes) that are used for different purposes in the claimed apparatus and require no construction. Defendants ask the Court to limit the claims to requiring that the air supplies originate from three "independent place[s] of origin." The claim language is not so limited, and there is no basis to do so in the intrinsic record. Indeed, doing so would exclude the preferred embodiment which discloses three supplies of air all originating from a single place of origin. '985 patent, 9:32-35; 9:59-61; 12:30-34; Ex. 9, Dkt. 359, ¶ 20.

### b. Defendants' Answering Brief

A POSA would have understood the terms "first supply source," "second supply source," and "third supply source" to each mean "an independent place of origin." Claim 1 of the '985 patent recites: "Apparatus for sterilizing a container comprising: a first supply source of sterile air; . . . a second supply source . . . of hot sterile air; . . . [and] a third supply source of a hot sterile drying air." In other words, the claim requires that the air supply sources be distinct from one another.

Steuben's position is that a single supply of air that feeds three different "pipes" would meet the claimed limitations. Steuben's construction ignores the "first," "second," and "third" limitations in the claim. Moreover, the specification describes each conduit having a separate, independent air-supply source. The first air supply travels through conduit 346 and the second air supply travels through conduit 348, as shown in Figure 21, and each having independent air supply sources:



'985 patent, Fig. 21 (annotated).

The first supply through conduit 346 comes from pressurized air source 318 and passes through sterile filter 340 before reaching conduit 348. '985 patent, 9:9-30. The second source comes from blower 364 and passes through heater 368 and sterile

98

filter 372 before reaching conduit 348.  The third source of sterile air, which passes through conduit 148, is supplied by "sterile air supply system 146." *Id.* 12:30-34. Thus, each source of sterile air is coupled to an independent place of origin.

Although Steuben would like this claim to be satisfied by a plurality of conduits from a single supply source, the specification states explicitly that "[t]he present invention includes *a plurality of sterile air supply sources*." *Id.* 2:40-42 (emphasis added). Each air supply source serves a different function: "a first supply source of sterile air is used to atomize a sterilant," "[a] second supply source of sterile air is used to provide hot sterile air to the atomized sterilant," and "[a] third supply source of sterile air is used to provide hot sterile air for activating and drying the sterilant on the interior surface of the container." *Id.* 2:42-48.

During reexamination of the '985 patent, the Patent Office rejected claim 1 as unpatentable over Andersson in combination with Foti. Exhibit P, office action in *Ex Parte* Reexamination, at 4-6.  The Examiner noted that, while Andersson did not explicitly disclose a "second 'non-intermittent' flow of air," Andersson's "disclosed structure was capable of providing a first and second air flows at the same time." *Id.* at 6. Figure 1 from Andersson is reproduced below, showing the "single source" of air that the Examiner stated could provide the first and second air flows:



U.S. Patent No. 5,258,162, Fig. 1 (Ex. Q) (annotated).

In response, Steuben argued separate supply sources—not a single source shunted through multiple conduits—were necessary. Specifically, Steuben argued that Andersson cannot operate with a continuous (i.e., non-intermittent) flow through branch 12, because leaving valve 20 open would render the system inoperable, meaning the proposed combined Andersson-Foti system does not meet the limitation 'second supply source providing a non-intermittent supply of hot sterile air to a conduit.'" Ex. P, Examiner Interview, Control No. 90/012,528, at Appendix 2 at 12 (May 29, 2013). Steuben submitted an expert declaration from Dr. Sastry explaining why Andersson cannot operate with valve 20 left open—inadequate pressure and

vaporization, irregular atomization, etc.—and arguing that "[t]hese problems do not occur in the system disclosed in the '985 patent because the disclosed system includes *two separate sources of air* for atomizing the sterilant, on the one hand, and for applying that atomized sterilant onto the containers, on the other hand." Ex. R, Sastry Decl. ¶ 24 (emphasis added). Thus, Steuben's own arguments during prosecution provide a further indication that the first, and third supply sources must be independent from one another.

### c. Steuben's Reply Brief

Shibuya attempts to support its construction that would require three independent places of origin by arguing that the patent discloses that each air supply comes from an independent place of origin. But the three "independent places of origin" according to Shibuya (pressurized air source 318, blower 364, and sterile air supply system 146) are not "places of origin" as Buie explains. Ex. 9, Dkt. 359, ¶ 21. For example, Shibuya argues that the "blower 364" is an independent place of origin for the "second supply source of hot sterile air." But the blower 364 blows only sterile air from an upstream source. It becomes a supply of hot sterile air after it passes through the heater 368. *Id.*, ¶22. The blower 364 is not the "place of origin" for a supply source of "hot sterile air" in a preferred embodiment or otherwise.

Shibuya's argument concerning the prosecution history also fails. Steuben's presentation to the Examiner cited by Shibuya explained that Anderson could not

meet the limitation of "second supply source providing a ***non-intermittent*** supply of hot sterile air to a conduit," "[b]ecause Anderson cannot operate with valve 20 ***continuously*** open." Ex. P, App'x 2 at 12 (emphasis added). Steuben's statement pertained to the non-intermittent portion of the limitation. Steuben did not argue that the claim required independent places of origin. In the cited portion of Sastry's declaration, he was discussing the preferred embodiment—not the claim language— and explaining how it was different than a prior art system. Sastry's testimony does not operate as a disclaimer.

### d. Defendants' Sur-Reply

The '985 patent describes the first, second, and third supply sources of air as having independent origins. Every embodiment shows that each air conduit receives air from an independent source.

The prosecution history confirms this. Steuben argued that the Andersson reference could not meet the "second supply source providing a non-intermittent supply" limitation. While Steuben now contends its prosecution statements addressed only the non-intermittent supply argument, this is untrue. Steuben provided labeled patent figures (below) showing the '985 patent having three independent supplies for the sterile air.



FIG. 21



FIG. 3

Ex. P, at Appendix 2 at 5-6.

**8.    "hot" (i.e. "hot sterile air" and "hot sterile drying air")**

| Steuben's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Not indefinite. <br><br> No construction necessary. | Indefinite <br> OR <br> "air that has been heated to 230ºF" |

### a. Steuben's Opening Brief

The term "hot" needs no specific construction in the context of the claim terms in which it appears. Defendants seek to limit the term "hot" to "air that has been heated to 230ºF," apparently in view of the disclosure in the specification that the air is heated to "about 230ºF." *See, e.g.,* '985 patent at 12:39-41. Defendants' construction seeks to modify the preferred embodiment and then limit the claims to the modified embodiment. There is no basis to do either. *Phillips*, 415 F.3d at 1334.

Both of these claim terms are capable of being understood with reasonable certainty. Dr. Sharon explains that "[t]he '985 patent gives guidance on what 'hot sterile air' could mean." Ex. 10, Dkt. 333-1, ¶¶ 35-37. Indeed, Defendant Shibuya understood the meaning of the "hot" sterile air terms such that it could seek reexamination of the '985 patent, which demonstrates that Defendants will be unable to carry their burden as to the indefiniteness of the "hot" limitations. *Sonix*, 844 F.3d at 1379.

### b. Defendants' Answering Brief

The terms "hot sterile air" or "hot sterile drying air" are indefinite because one cannot tell, with reasonable certainty, what air temperature to use to avoid infringement. The claims thus fail to fulfill the needed public-notice function. *See Nautilus*, 134 S. Ct. at 2129 (quoting *Markman*, 517 U.S. at 373).

The patent provides no guidance as to what would be considered "hot."  In discussing the "second supply of hot sterile air," the specification reveals only the source and use of the air without describing its temperature: "A second supply of hot sterile air is supplied to the atomized sterilant through a conduit 378 . . . The second supply of hot sterile air assists in obtaining a uniform concentration of hydrogen peroxide in the air stream." '985 patent, 9:46-65. For the "third supply of hot sterile air," the specification discloses a specific temperature but fails to describe a lower boundary between "hot" and not "hot": "[A] third supply of hot sterile air is provided through the sterile air supply system 146 . . . The air is first passed through a filtration system to sterilize the air. The air is then heated in a heating system to about 230°F." *Id.* at 12:33-41. Because a POSA could not be reasonably certain as to the scope of "hot sterile air" or "hot sterile drying air," these terms are indefinite.

Although the patent describes that hot sterile air is first cooled before being applied at temperatures of about 131°F, the patents do not describe whether the cooled air is still "hot." Steuben's expert Sharon testified that 131°F was not the minimum temperature for the sterile air to be considered "hot." Exhibit L, Sharon Tr. 85:14-86:14. Yet Sharon refused to provide even a "rough approximation" of the lower threshold of "hot sterile drying air." *Id.* 91:14-94:15. Nor could Sharon say whether a temperature within 20 degrees of 131°F would be considered hot:

> Q.      I want to make sure we're clear on the record. I asked you within 20 degrees. So if you're within 20 degrees of 131 degrees Fahrenheit, that's considered hot?
>
> …
>
> Q.      with reasonable certainty
>
> …
>
> A.      I cannot give you that answer as I stand here today. I would need to think about it more, and see if it -- you know, if we go 20 degrees below, if it's hot enough to assist with the drying. And if – if -- if it is, then I would say yes, it's, you know, it's hot.

*Id.* 96:1-14.

Steuben fails to identify where the lower temperature boundary lies. To distract attention from that failure, Steuben points out that Shibuya was able to provide prior art to the Patent Office that disclosed "hot" sterile drying air. That is of no moment for two reasons. First, the indefiniteness inquiry is concerned with the boundaries of the claim. *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) ("The claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art."). Second, it is impermissible to challenge indefiniteness in a reexamination, so that issue could not have been raised in that proceeding. *In re Recreative Techs. Corp.*, 83 F.3d 1394, 1397 (Fed. Cir. 1996) ("No grounds of reexamination were to be permitted other than based on new prior art and sections 102 and 103."). That Shibuya could produce prior art well within the uncertain outer boundaries of the claim term does not establish the claims as not indefinite.

If the Court concludes that "hot" is not indefinite, then "hot sterile [drying] air" should be construed to mean air that has been heated to at least 230°F (even if it cools down somewhat before being used). 230°F is the only air temperature that the specification clearly refers to as "hot": "Hot sterile air is supplied to the sterile air supply system 146 through conduit 148. The air is first passed through a filtration system to sterilize the air. The air is then *heated in a heating system to 230°F*." '985 patent, 12:38-41 (emphasis added).

During reexamination of the related U.S. Patent No. 6,475,435, Steuben disclaimed temperatures lower than 230°F as being "hot." Steuben overcame a rejection over prior art after its expert declared that the '435 patent "teaches that the air must be heated to 230°F to achieve effective activation of the sterilant." Ex. M, Nelson Decl. ¶ 28. In contrast, air temperature between 150°F and 190°F, as disclosed in the prior art, would not activate the sterilant. *Id.* Thus, air must be heated to 230°F to activate the sterilant; otherwise, the claimed invention would be inoperable. Accordingly, if the term is not indefinite, "hot sterile [drying] air" should mean air that has been heated to 230°F.

### c. Steuben's Reply Brief

Shibuya offers no testimony from a POSITA suggesting that the scope of this term cannot be understood with reasonable certainty and has failed to carry its burden by clear and convincing evidence.

The specification (at 9:46-51) explains that the second supply of hot sterile air is heated with a heater (*e.g.*, an electric heater) and then mixed with the atomized hydrogen peroxide.  In this preferred embodiment, the atomized hydrogen peroxide is not heated until it mixes with the second supply of sterile air.  When that mixing occurs, the mixture passes through a double tube heat exchanger, and "the temperature of the atomized hydrogen peroxide is typically about the same as the supplied steam heat[ing]" the double tube heat exchanger.  *Id.*, 10:22-25.  In another embodiment, the second supply of hot sterile air is hot enough to vaporize the sterilant without the need for a heat exchanger.  *Id.*, 10:26-29.  The specification then explains that "[t]he temperature of the atomized gas entering the interior **118** of the bottle **12** is the range of about 100° C to 120° C."  *Id.*, 10:31-32.

The foregoing indicates that in the preferred embodiment the second supply of hot sterile air is hot enough to heat the sterilant to a threshold temperature of 100°C, which, while not limiting the claim, informs a POSITA as to the scope of the claim.  *See Guangdong Alison Hi-Tech Co. v. ITC*, 936 F.3d 1353, 1360 (Fed. Cir. 2019); *Sonix*, 844 F.3d at 1378-79.

The '985 patent also provides a POSITA with information that allows the POSITA to determine how hot the "third supply source of hot sterile drying air" is.  As the Federal Circuit has explained, "[f]unctional language can promote[] definiteness because it helps bound the scope of the claims by specifying the

operations that the [claimed invention] must undertake." *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1346 (Fed. Cir. 2018) (internal quotation omitted) (first alteration added).  The claim language includes functional language informing the POSITA of the scope of the claim by reciting "hot sterile ***drying*** air ***for activating and drying the sterilant*** . . . ."  Activating the sterilant is understood to cause "the hydrogen peroxide sterilant to break down into water and oxygen," which "kill[s] any bacteria on the bottles 12 . . . ."  '985 patent, 7:29-31.  A POSITA generally understands the threshold temperature at which hydrogen peroxide will break down into water and oxygen, which informs the scope of the claims.  *Id.*, 6:53-7:32.

The specification provides further guidance to a POSITA.  For example, the third supply of hot sterile air for drying and activating sterilant "is [] heated in a heating system to about 230° F."  *Id.*, 12:40-41.  The air is then applied to the bottles, and the "hot sterile air leaves the nozzles **150** at about 230° F."  *Id*., 13:9-10.  This example provides a POSITA with an understanding of what is meant by "a third supply source of hot sterile drying air for activating and drying."  *See Guangdong*, 936 F.3d at 1360.

Shibuya attempts to support its position by citing to Sharon's testimony.  In the cited testimony, Sharon explains that he had not considered the particular question asked by Shibuya's counsel and was, therefore, not prepared to offer an

opinion in his deposition.   Sharon did, however, explain that the premise of Shibuya's line of questioning was divorced from the way in which a POSITA would consider the "hot" sterile air claims because a POSITA would not engage in a guessing game to determine what "would not be hot."  Ex. L, at 88:17-89:15.  A POSITA understands the term "hot sterile air" in the context of the specification, which provides examples that indicate what type of temperatures would be hot.  The Court should reject Shibuya's argument that the claim must define hot by a specific temperature with mathematical certainty.  *See Sonix*, 844 F.3d at 1377.

The Court should also reject Shibuya's argument that "'hot sterile [drying] air' should mean air that has been heated to 230°F" as an improper attempt to limit the claim to a preferred embodiment.  *See Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012).  Nelson's testimony cited by Shibuya is directed to another patent claim that does not include the word "hot" and refers to "the working example provided by the inventor."  Nelson's discussion of the preferred embodiment in a different patent does not operate as a clear disclaimer of claim scope.

### d.  Defendants' Sur-Reply

Steuben argues that a POSA would not try to determine temperatures that "would not be hot." *Supra* at 110-111. But this is exactly the inquiry a POSA would conduct to avoid infringement. Because the line between hot and not hot is unclear,

the '985 patent does not sufficiently disclose to the public what remains in the public domain.

Steuben offers no coherent theory to distinguish between hot and not hot. Although Steuben contends the air needs to be hot enough to activate and dry the sterilant, it provides no evidence showing at what temperature that occurs. Steuben's experts testify only in the negative: air between 150°F and 190°F does *not* activate and dry the sterilant (Ex. M, Nelson Decl. ¶ 28), and while "hot is many temperatures," it was unknown whether +/- 20° of 131° F would be "hot enough to assist with the drying." Ex. L, Sharon Tr. 94:17-95:21; 85:14-86:14. The term is indefinite.

### D.    Conclusion

#### a.  Defendants' Answering Brief

The Court should adopt Shibuya's proposed constructions.

#### b.  Defendants' Sur-Reply

The Court should adopt Shibuya's proposed constructions.

DATED: July 22, 2020                    */s/ Timothy Devlin*
                                        Timothy Devlin (No. 4241)
                                        DEVLIN LAW FIRM LLP
                                        1526 Gilpin Avenue
                                        Wilmington, DE 19806
                                        (302) 449-9010
                                        tdevlin@devlinlawfirm.com

                                        W. Cook Alciati
                                        GARDELLA GRACE P.A.
                                        80 M Street SE, 1st Floor
                                        Washington, DC 20003
                                        (703) 556-9600
                                        calciati@gardellagrace.com
                                        *Attorneys for Plaintiff Steuben Foods, Inc.*

DATED: July 22, 2020                    */s/ Karen E. Keller*
                                        Karen E. Keller (No. 4489)
                                        Jeff Castellano (No. 4837)
                                        Nathan R. Hoeschen (No. 6232)
                                        SHAW KELLER LLP
                                        I.M. Pei Building
                                        1105 North Market Street, 12th Floor
                                        Wilmington, DE 19801
                                        (302) 298-0700
                                        kkeller@shawkeller.com
                                        jcastellano@shawkeller.com
                                        nhoeschen@shawkeller.com

                                        J.C. Rozendaal
                                        Byron L. Pickard
                                        Michael E. Joffre
                                        Jean Paul Y. Nagashima
                                        Anna G. Phillips
                                        William H. Milliken
                                        Robert E. Niemeier
                                        STERNE, KESSLER, GOLDSTEIN & FOX, P.L.L.C.
                                        1100 New York Ave. NW, Suite 600
                                        Washington, DC 20005

(202) 371-2600
jcrozendaal@sternekessler.com
bpickard@sternekessler.com
mjoffre@sternekessler.com
ynagashima@sternekessler.com
aphillips@sternekessler.com
wmilliken@sternekessler.com
rniemeier@sternekessler.com
*Attorneys for Defendants Shibuya Hoppmann Corporation, Shibuya Kogyo Co., Ltd., and HP Hood LLC*